[No. C054228. Third Dist. June 18, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH MICHAEL WILKINSON, Defendant and Appellant.

COUNSEL

Blackmon & Associates, Clyde M. Blackmon, Jonathan C. Turner, Emily E. Doringer and Melinda J. Nye for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, John G. McLean and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**ROBIE, J.**—After the denial of his motion to suppress evidence, defendant Joseph Michael Wilkinson pled no contest to a charge of burglary arising from his entry into the room belonging to his roommate,[1] Jessica Schultze, to use her webcam[2] to obtain computer images of her and her boyfriend, Harry Sadler. The trial court placed defendant on probation on the condition that he serve 180 days in jail.

On appeal, defendant contends the trial court erred in denying his suppression motion because Sadler was acting as an agent for the police when he entered defendant's room without permission and seized a number of compact discs that contained images from the webcam that defendant had copied from Schultze's computer. Defendant also contends the police performed an illegal search when they viewed some of those images. Defendant asserts that his subsequent incriminating statement to police and his consent to search his room were tainted by the prior illegalities.

We conclude Sadler did not act as a police agent when he took the compact discs from defendant's room and viewed some of the images on them. We also conclude that no illegal search occurred when Sadler showed police some of the images he had viewed. An illegal search did occur, however, when police—acting without a search warrant—directed Sadler to show them additional images and, on their own, looked at some of the discs without knowing whether those discs were ones Sadler had already viewed.

Because the trial court erroneously concluded that no illegal search occurred, the court never reached the issue of what evidence, if any, was subject

---

[1] We use the colloquial term roommate, although defendant and Schultze had separate bedrooms in the apartment they shared.

[2] A webcam is "a camera used in transmitting live images over the World Wide Web." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 1418, col. 1.) Here, the webcam recorded video images that were saved as files on Schultze's computer.

to suppression as a result of the illegality. Thus, the trial court never decided whether defendant's incriminating statement to police and his consent to search his room were tainted by the illegality. Because we believe the trial court should have the opportunity to decide those issues in the first instance, we will reverse the judgment (order granting probation) and remand the case with instructions.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 2005, defendant and Schultze, who had been friends for several years, were sharing an apartment with a third person. Each of the three had his or her own room. In her room, Schultze had a computer with a webcam attached to it, which she used primarily for video conversations over the Internet. At that time, Sadler was either "spending a lot of time" at the apartment or had moved into Schultze's room.

On September 4, 2005, Sadler discovered a video file on Schultze's computer that showed defendant in Schultze's room. Suspicious that defendant was using the webcam to record them, Sadler conducted an investigation to determine "if things were being changed on the computer while [he and Schultze] were away." Over the next several days, he determined that someone was deleting video files on the computer that the webcam had recorded and moving the webcam so that it pointed at the bed.

On the evening of September 7, 2005, City of Sacramento Police Officer James Walker responded to a complaint by Sadler and Schultze that defendant was using a webcam to record them. Initially, Officer Walker and his partner spoke with Sadler and Schultze outside of the apartment while defendant was inside. The officers then went inside to speak to defendant. Officer Walker asked defendant if he could look around defendant's room, but defendant refused to give his consent.

After speaking with defendant, the officers took him to their patrol car. Officer Walker told Sadler and Schultze that he did not have probable cause to arrest defendant, but he was "willing to accept their citizens arrest," and he explained that "the report would be forwarded to the detectives, that there would probably be some follow-up, [and] that they would have to . . . contact the detectives to ensure they wanted to pursue prosecution." Sadler "was upset . . . because he thought there was gonna be more of an investigation on [Officer Walker's] part and that wasn't met." Officer Walker explained to Sadler that he could not search defendant's room because defendant had refused to allow him to do so. At that point, Sadler asked if he could go into defendant's room. Officer Walker told Sadler, "Well, you can do whatever you want. It's your apartment. . . . But keep in mind, you cannot act as an

agent of my authority. I cannot ask you to go into the room, nor can you go into the room believing that you're doing so for myself." Officer Walker also told Sadler and Schultze that defendant had asked that they not go into his room. Following his conversation with Sadler and Schultze, Officer Walker took defendant to the jail for booking.

Sadler testified he was concerned that it would violate the law for him to go into defendant's room, so he told the officer he intended to go into defendant's room to look for evidence and asked the officer if that would violate the law. Sadler could not identify by name the officer to whom he had spoken. The officer responded that Sadler could go anywhere in the apartment and pick up anything he found lying around anywhere in the apartment, which Sadler understood to include defendant's room.

After the officers left, Sadler and Schultze discussed what they should do, and Sadler decided to go into defendant's room to look for more evidence. He entered defendant's room and picked up about 15 to 20 compact discs he found strewn around the room. Some bore dates or words, but nothing indicating their contents. He took them to Schultze's room where he viewed three to five of them on Schultze's computer. On them he found images of Schultze's room and images of himself and Schultze "hanging out," "undressing," and "being naked," with some sexual content but no images of them having sexual intercourse. He went back to defendant's room, opened drawers, and took all the writable compact discs he could find.

Sadler returned to Schultze's computer and viewed about five to seven more of the discs. Every file showed a picture of the first image of the recording. Sadler opened files that seemed to have images of himself and Schultze naked or engaged in sexual conduct.

Meanwhile, at the police station, Officer Walker's sergeant "overruled" defendant's arrest. Officer Walker brought defendant home and left him in the patrol car while he explained to Sadler why defendant was no longer under arrest. Sadler told Officer Walker he had found evidence of defendant having taken images from Schultze's computer, put them on compact discs, and taken them back to his room. He also told Officer Walker about what was contained on some of the compact discs. Officer Walker and Sadler went to Schultze's room, where Sadler showed the officer images on two of the compact discs he had already viewed. Officer Walker told Sadler he would need to see more explicit images of Sadler and Schultze having sexual intercourse, and Sadler looked through seven to 10 more discs to find the images the officer wanted.

Ultimately, Officer Walker took 36 compact discs Sadler had removed from defendant's room. At the police station, Detective Jimmy Vigon viewed

images from "several" discs, which consisted of Sadler and Schultze "just sitting around watching TV to actually having sex." After viewing those images, he interviewed defendant. He told defendant that he had been looking at discs the victims had retrieved out of defendant's bedroom. Defendant admitted obtaining the images from Schultze's computer. Defendant also signed a consent form allowing the police to search his room.

After he was charged with unauthorized access and taking of computer data, defendant filed a motion to suppress. A charge of eavesdropping was later added to the complaint. The hearing on the motion to suppress was conducted simultaneously with the preliminary examination.

Based on the evidence from the joint hearing, defendant argued that "Sadler's taking of the disks amounted to an illegal warrantless search" "[b]ecause he was acting as an agent of the police" and that "Officer Walker's examination of the disks' content without a warrant was also illegal." Defendant did not direct any argument specifically to Detective Vigon's viewing of images from the compact discs before he interviewed defendant.

In ruling on the motion to suppress, the trial court first concluded that Sadler did not act as an agent of the police, explaining as follows: "I don't see in this case that Mr. Sadler was authorized by Officer Walker to conduct the search. It certainly wasn't a joint operation. I don't see a situation where Officer Walker had knowledge. I think he had an intuition. I think he probably testified, if I recall, he thought that Mr. Sadler was probably gonna conduct a search and advised him that Walker couldn't do it, but that Sadler was free on his own to do whatever he wanted, but that [defendant]'s preference was that nobody would enter his room. But I don't think that rises to the level where we can construe [sic] the officer with that knowledge and makes [sic] Mr. Sadler, thereby, an agent. I don't think it's express authorization. And I don't think that, without more, consists of tacitly approving or authorizing a search. So, I don't find that this is an agency situation as the cases that I have read interpret it."

As to Officer Walker's viewing of images on the compact discs, the court stated, "It's not clear from the record whether or not the scope [of the private search by Sadler] was exceeded by viewing the tapes, but certainly Sadler had viewed the tapes, obviously he viewed the tapes. Otherwise they have no probative value when Officer Walker returned with [defendant]. And he would not have said, I have some new evidence that might change your mind, and we witness, at least excerpts, from some of the tapes. [¶] So, the question I guess still is a little bit open, whether or not that is exceeding the scope of the search if, in fact, [Officer] Walker took all of the tapes, although he did not view them with Mr. Sadler prior to confiscating them and then using

them, but certainly conceptually, if Mr. Sadler is showing Mr. Walker some of the tapes that Sadler confiscated from [defendant], and those tapes at least consist of these images from which a violation occurs, then f[or] my purposes, I don't see a violation for the [F]ourth [A]mendment for this hearing, because the images at least I viewed, were the ones that were shown to Walker by Sadler."[3]

Based on this reasoning, the trial court denied the motion to suppress. After an amended information was filed adding a charge of first degree burglary, defendant pled no contest to that charge in exchange for dismissal of the other two charges and a promise of probation with a 180-day jail term. The trial court sentenced defendant in accordance with the plea agreement.

## DISCUSSION

### I

### *Standard of Review*

■ In ruling on a suppression motion, "the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] . . . [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, viz., the reasonableness of the challenged police conduct, is also subject to independent review. [Citations.] The reason is plain: 'it is "the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness." ' " (*People v. Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221].)

### II

### *The Trial Court Erred in Determining That No Illegal*
### *Search Occurred*

Several searches potentially subject to the Fourth Amendment occurred in this case. First, Sadler (whom defendant claims acted as an agent for the

---

[3] Defendant notes that the record does not establish the images viewed by the court were the same images that Sadler showed Officer Walker. Instead, the record merely indicates the trial court viewed images taken from Schultze's and defendant's computers.

police) searched defendant's room and the contents of some of the compact discs he took from defendant's room during Officer Walker's absence from the apartment. Second, when Officer Walker returned to the apartment, he viewed the contents of some of the compact discs that Sadler had viewed during his absence. Third, Sadler and Officer Walker together viewed additional images at Officer Walker's direction. Fourth, Detective Vigon viewed images at the police station.

As we will explain, we will conclude that (1) Sadler's "search" of defendant's room and of the contents of some of defendant's compact discs during Officer Walker's absence was a private search that did not implicate the Fourth Amendment; and (2) Officer Walker's viewing of the images Sadler had already seen did not exceed the scope of the private search and therefore did not violate the Fourth Amendment; but (3) the opening and viewing of images on additional compact discs by Sadler and Officer Walker, at Officer Walker's direction (to the extent it may have occurred), and the subsequent viewing of images by Detective Vigon (to the extent he may have looked at discs Sadler had not previously viewed), constituted warrantless governmental searches implicating the Fourth Amendment for which the People fail to show any legal justification.

### III

#### Defendant's Expectation of Privacy in the Compact Discs

Defendant first contends he had a reasonable expectation of privacy in the contents of the compact discs located in his room. The People disagree, contending he "did not have a legitimate expectation of privacy in the stolen images of his roommates' private sex life." According to the People, "While [defendant] may subjectively have expressed an interest in keeping the disks private by keeping them in his room and asking people to stay out, the voyeuristic images are not the kind of material that society is willing to recognize as a legitimate privacy interest."

We find the People's argument rather startling, inasmuch as acceptance of it would largely obliterate the Fourth Amendment, because whenever a criminal prosecution is premised on contraband discovered during a warrantless search, the search that led to discovery of the contraband could always be justified on the ground the defendant did not have a legitimate expectation of privacy in the contraband. We know of no authority that supports such a broad proposition.[4] Certainly that proposition is not supported by the only

---

[4] There is authority for the proposition that "no privacy right guaranteed by the Fourth Amendment is infringed by the search and seizure of a *known* illicit substance . . ." (*People v.*

two cases the People cite. The first case—*California v. Ciraolo* (1986) 476 U.S. 207 [90 L.Ed.2d 210, 106 S.Ct. 1809]—stands for no more than the proposition that "naked-eye observation of the curtilage [around a house] by police from an aircraft lawfully operating at an altitude of 1,000 feet" does not "violate[] an expectation of privacy that is reasonable." (*Id.* at pp. 213–214 [90 L.Ed.2d at pp. 216–217].) The other case—*Katz v. United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507]—stands for the proposition that prior judicial authorization is necessary for electronic surveillance of a public telephone booth. Neither case supports the People's argument that defendant lacked a legitimate expectation of privacy in the contents of the compact discs Sadler found in his room.

## IV

### *Sadler's Search of Defendant's Room and His Initial Viewing of the Contents of Some of the Compact Discs He Found There*

Defendant next contends Sadler acted as an agent for the police in searching defendant's room and in his initial viewing of defendant's compact discs. We disagree.

 The Fourth Amendment's prohibition against unreasonable searches and seizures does not apply to searches by private citizens, even if the private citizens act unlawfully, unless the private citizen can be said to be acting as an agent for the government. (*People v. Warren, supra*, 219 Cal.App.3d at p. 622; *U.S. v. Jarrett* (4th Cir. 2003) 338 F.3d 339.) "Whether a private citizen is acting as a de facto police officer is an issue of fact and thus an issue for the trial court." (*Warren*, at pp. 622–623.)

Defendant cites *People v. North* (1981) 29 Cal.3d 509 [174 Cal.Rptr. 511, 629 P.2d 19], in which our Supreme Court stated that " 'in appropriate circumstances a private citizen may . . . be deemed to act as an agent of the police when the latter merely "stand silently by," i.e., when they *knowingly* permit the citizen to conduct an illegal search for their benefit and make no effort to protect the rights of the person being searched. [Citation.]' [Citation.] . . . 'This rule forestalls belated police claims that they did not actually "direct" or "request" their lay associate to undertake the illegal search, and thereby prevents them from doing indirectly—by silent but unmistakable approval—what they cannot constitutionally do directly.' " (*Id.* at p. 515.)

*Warren* (1990) 219 Cal.App.3d 619, 624 [268 Cal.Rptr. 381], italics added); however, that proposition does not apply to the compact discs found in defendant's room, because it was not apparent without actually looking at the files contained on those discs that the files had been copied from Schultze's computer.

The court in *North* also stated that " 'the police need not have requested or directed the search in order to be guilty of "standing idly by"; *knowledge* of the illegal search *coupled* with a failure to protect the petitioner's rights against such a search suffices.' " (*Id.* at p. 514.)

■ Defendant contends *North* governs here because "Officer Walker knew that Sadler was going to search [defendant]'s bedroom." Even if we were to agree with defendant's assessment of Officer Walker's knowledge—despite the trial court's express finding to the contrary—it would make no difference because *North*—decided in 1981—is no longer good law in California, given the 1982 adoption of Proposition 8, the "Truth-in-Evidence" provision of the California Constitution (art. I, § 28, subd. (d)). Proposition 8 eliminated the exclusionary rule in California as a remedy for violations of the search and seizure provisions of the federal or state Constitutions, except to the extent that exclusion remains compelled by federal constitutional law. (*In re Lance W.* (1985) 37 Cal.3d 873, 886–887 [210 Cal.Rptr. 631, 694 P.2d 744].) We therefore look to federal law, where we see that, to the extent *North* requires nothing more than the officer's knowledge and failure to protect the defendant's rights to attribute a private search to the government, such a standard is no longer valid.

In *Coolidge v. New Hampshire* (1971) 403 U.S. 443, 444 [29 L.Ed.2d 564, 565, 91 S.Ct. 2022], the United States Supreme Court concluded that a wife was not acting as an instrument or agent of the government when officers came to her home in her husband's absence, asked if her husband had guns and what he was wearing on the night of the murder victim's disappearance, and accompanied her into the bedroom where she (believing her husband had nothing to hide) took guns and clothes out of the closet and offered them to the police. "[I]t is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." (*Id.* at p. 488 [29 L.Ed.2d at p. 595].)

The federal standard, as explained in *U.S. v. Jarrett, supra*, 338 F.3d 339, is as follows:

■ "The Fourth Amendment protects against unreasonable searches and seizures by Government officials and those private individuals acting as 'instrument[s] or agent[s]' of the Government. [Citations.] It does not provide protection against searches by private individuals acting in a private capacity. [Citation.] Thus, ' "evidence secured by private searches, even if illegal, need not be excluded from a criminal trial." ' [Citations.]

"Determining whether the requisite agency relationship exists 'necessarily turns on the degree of the Government's participation in the private party's

activities, . . . a question that can only be resolved "in light of all the circumstances." ' [Citation.] This is . . . 'a fact-intensive inquiry that is guided by common law agency principles.' [Citation.] The defendant bears the burden of proving that an agency relationship exists. [Citation.]

"In order to run afoul of the Fourth Amendment, therefore, the Government must do more than passively accept or acquiesce in a private party's search efforts. Rather, there must be some degree of Government participation in the private search. . . .

". . . [T]wo primary factors . . . should be considered in determining whether a search conducted by a private person constitutes a Government search triggering Fourth Amendment protections. These are: (1) whether the Government knew of and acquiesced in the private search; and (2) whether the private individual intended to assist law enforcement or had some other independent motivation. [Citations.] . . .[5] [¶] . . . [¶]

"[The first factor] require[s] evidence of more than mere knowledge and passive acquiescence by the Government before finding an agency relationship. [Citation.] . . . *See, e.g., United States v. Smythe*, 84 F.3d 1240, 1242–43 (10th Cir.1996) ('[K]nowledge and acquiescence . . . *encompass the requirement* that the government must also affirmatively encourage, initiate or instigate the private action.' . . .); *United States v. Koenig*, 856 F.2d 843, 850 (7th Cir.1988) ('It is only by the exercise of some form of control that the actions of one may be attributed to another. Mere knowledge of another's independent action does not produce vicarious responsibility absent some manifestation of consent and the ability to control.' . . .); [*United States v.*] *Walther*, [(9th Cir. 1981)] 652 F.2d [788,] 792 ('Mere governmental authorization of a particular type of private search in the absence of more active participation or encouragement is similarly insufficient to require the application of fourth amendment standards.' . . .).

"Viewed in the aggregate, then, three major lessons emerge from the case law. First, courts should look to the facts and circumstances of each case in determining when a private search is in fact a Government search. Second, before a court will deem a private search a Government search, a defendant

---

[5] Both prongs must be satisfied before the private search will be deemed a government search. (*U.S. v. Souza* (10th Cir. 2000) 223 F.3d 1197, 1200 [finding governmental search where a police detective who was at a UPS facility for training purposes told a UPS employee that a narcotics dog had alerted to a suspicious package, and he could not tell her to open it, " 'but there it is on the floor,' " and the employee was influenced by the detective to open the package, and the detective helped the employee when she had trouble opening the package].) The greater the government involvement in the search, however, the less important is the private searcher's intent. (*Presley v. City of Charlottesville* (4th Cir. 2006) 464 F.3d 480, 488.)

must demonstrate that the Government knew of and acquiesced in the private search and that the private individual intended to assist law enforcement authorities. Finally, simple acquiescence by the Government does not suffice to transform a private search into a Government search. Rather, there must be some evidence of Government participation in or affirmative encouragement of the private search before a court will hold it unconstitutional. Passive acceptance by the Government is not enough." (*U.S. v. Jarrett, supra*, 338 F.3d at pp. 344–346, fn. omitted.)

In *Jarrett*, an anonymous computer hacker who identified himself only as Unknownuser hacked into the defendant's computer, discovered child pornography, and sent it to law enforcement authorities. The hacker had previously done the same with a different defendant, who was convicted. In the previous case, an FBI agent thanked the hacker for his help, assured him he would not be prosecuted for illegal hacking, and said, " 'If you want to bring other information forward, I am available.' " (*U.S. v. Jarrett, supra*, 338 F.3d at p. 341.) After Jarrett's arrest, the FBI agent exchanged e-mails with the hacker, stating in part, " 'I can not [*sic*] ask you to search out cases such as the ones you have sent to us. That would make you an agent of the Federal Government and make how you obtain your information illegal and we could not use it against the men in the pictures you send. But if you should happen across such pictures as the ones you have sent to us and wish us to look into the matter, please feel free to send them to us. . . . [A]s long as you are not "hacking" at our request, we can take the pictures and identify the men and take them to court.' " (*Id.* at p. 343.)

In reversing the district court's finding of agency, the circuit court reasoned as follows: "That the Government did not actively discourage Unknownuser from engaging in illicit hacking does not transform Unknownuser into a Government agent. Although the Government's behavior in this case is discomforting, the Government was under no special obligation to affirmatively discourage Unknownuser from hacking." (*U.S. v. Jarrett, supra*, 338 F.3d at p. 347, fn. omitted.)

■ This same standard was applied in *Warren*, in which the court held there was no Fourth Amendment violation where an employee of a shipping and receiving company opened a package the defendant sought to ship via UPS, saw a white substance rather than the printed material claimed by the defendant to be in the package, and then called an investigating officer of UPS who in turn called the police. (*People v. Warren, supra*, 219 Cal.App.3d at pp. 621–623.) The court in *Warren* stated, "It is well settled that the 'Fourth Amendment's prohibition against unreasonable search and seizure does not apply to searches by private citizens.' [Citations.] . . . 'While a certain degree of governmental participation is necessary before a private citizen is transformed into an agent of the state, *de minimis* or incidental contacts between

the citizen and law enforcement agents prior to or during the course of a search or seizure will not subject the search to fourth amendment scrutiny.' [Citation.] The relevant factors used in determining whether the governmental participation is significant, or de minimis, are '(1) the government's knowledge and acquiescence, and (2) the intent of the party performing the search.' " (*Id.* at p. 622.)

As to the second factor—the intent of the private party performing the search—a dual motive will not necessarily bring the search within the Fourth Amendment. Thus, in *U.S. v. Cleaveland* (9th Cir. 1994) 38 F.3d 1092, an electric company employee received an anonymous tip about power diversion and possible marijuana growing at the defendant's house. The employee asked the police to be present when he went to investigate in order to protect him from any danger and to obtain a warrant if necessary to confirm a power theft. (*Id.* at p. 1093.) The police detective waited in a parked car a block away while the employee went onto the defendant's property (as authorized by the electric company's customer service agreement) to examine the meter mounted outside the house. Although the hookup appeared normal, the employee removed brackets and pipes and discovered evidence of power theft, which the detective used to obtain a search warrant, which revealed marijuana plants, firearms, and further evidence of power diversion. (*Ibid.*) In concluding the employee was not acting as a government agent, the Ninth Circuit Court of Appeals stated that "[w]hile [the employee] may have had dual motives for conducting the search—to recover money for [the electric company]'s loss of power on the one hand, and to assist the police in capturing the power thief (and perhaps uncovering a marijuana grow) on the other—his motive to recover for [the electric company]'s loss of power was a legitimate, independent motive apart from crime detection or prevention. That motivation was not overridden by the fact the police stood by during the search, and used the fruits of that search to obtain a warrant to search Cleaveland's house. [Citation.] [¶] We recognize that the mere existence of a legitimate, independent motive apart from crime detection or prevention does not immunize a search from scrutiny regardless of the level of government involvement. [Citation.] However, in this case the government's participation was not so extensive as to trigger Fourth Amendment scrutiny." (*Id.* at p. 1094.)

Here, the evidence—viewed in the light most favorable to the trial court's decision—demonstrates that the police did not affirmatively encourage, instigate, or initiate Sadler's search of defendant's room, his seizure of the compact discs he found there, or his viewing of some of those discs during the time the officers had defendant out of the apartment. We reject defendant's argument that Officer Walker actively encouraged the search merely by telling Sadler (rightly or wrongly) he had the right to search. Moreover, as to Sadler's intent, there is substantial evidence that he and Schultze had the dual

intent of helping the police investigation *and* getting the stolen images back from defendant. As we have noted, Sadler testified that after the officers left with defendant, he and Schultze talked about what they should do before he (and Schultze) entered defendant's room. In addition, Schultze testified that she would have gone into defendant's room even if Officer Walker had told her it was not okay because she wanted to get back any images of herself and Sadler that defendant had taken. This evidence supports the conclusion that Sadler intended to help the police *and* take the stolen images back from defendant.

In sum, we conclude there was insufficient government participation in the search of defendant's room, the seizure of the compact discs, and the initial viewing of some of those discs to implicate the Fourth Amendment. With that conclusion in mind, we turn to the events after Officer Walker returned to the apartment.

### V

*Officer Walker's Viewing of Images from the Compact Discs*

Defendant next argues that there was no justification for Officer Walker's failure to obtain a search warrant before viewing the compact discs taken from defendant's room, and even if Sadler's search was a private search, Officer Walker impermissibly expanded the scope of the private search by not limiting his viewing to the images Sadler had previously viewed. Defendant contends the discs were closed containers, the contents of which remained concealed from plain view at the time Officer Walker seized them, and the fact that Sadler had viewed some of the contents of the discs did not excuse Officer Walker from obtaining a warrant to search them. Defendant contends the evidence does not establish that the images on the first discs Sadler showed Officer Walker were the same images that Sadler had viewed already.

For the reasons that follow, we will conclude that the record sufficiently establishes that Sadler showed Officer Walker images Sadler had viewed already, and Officer Walker's viewing of those images was within the scope of the private search and therefore did not implicate the Fourth Amendment. As to any additional images that Sadler had not previously viewed, which he showed to Officer Walker at Officer Walker's direction, however, the viewing of those images expanded the private search and constituted a governmental search subject to the Fourth Amendment.

A government agent's viewing of what a private party has freely made available for his inspection does not violate the Fourth Amendment. (*United States v. Jacobsen* (1984) 466 U.S. 109, 119 [80 L.Ed.2d 85, 98,

104 S.Ct. 1652].) However, the Fourth Amendment's protections do apply to a government search conducted after a private search to the extent the government's inquiry is more intrusive or extensive than the private search. (*Walter v. United States* (1980) 447 U.S. 649, 657 [65 L.Ed.2d 410, 418, 100 S.Ct. 2395] (plur. opn. of Stevens, J.).) The fact that law enforcement agents are lawfully in possession of containers does not give them authority to conduct a warrantless search of the contents of those containers. (*Id.* at p. 654 [65 L.Ed.2d at p. 416].) "[A]dditional invasions of . . . privacy by the Government agent must be tested by the degree to which they exceeded the scope of the private search." (*United States v. Jacobsen, supra*, 466 U.S. at pp. 111, 115 [80 L.Ed.2d at pp. 92–93, 95] [where a Federal Express employee opened a damaged package and found plastic bags of white powder inside a closed tube and called federal authorities, the agent did not violate the Fourth Amendment by opening the plastic bags and performing a chemical test confirming the powder was cocaine].)

Although we find no California case on point, federal case law has held that police officers exceed the scope of a private search when they fail to confine their examination of the contents of computer discs to the discs the private searcher examined. (*U.S. v. Runyan* (5th Cir. 2001) 275 F.3d 449; see generally Annot., Validity of Search or Seizure of Computer, Computer Disk, or Computer Peripheral Equipment (2000) 84 A.L.R.5th 1; Kerr, *Searches and Seizures in a Digital World* (2005) 119 Harv. L.Rev. 531.)

Though not cited by the parties and not binding on us, *Runyan* provides a thoughtful and persuasive analysis of the issues we confront in this case. There, a defendant in a child pornography case argued the police violated the Fourth Amendment by a warrantless examination of tangible materials, including computer discs, taken from his property by his wife (from whom he was separated). (*U.S. v. Runyan, supra*, 275 F.3d at pp. 452–453, 456.) The police looked at the contents of a greater number of discs than the wife did during her private search. (*Id.* at p. 460.) The appellate court accepted the parties' stipulation that the computer discs were closed containers. (*Id.* at p. 458.) The court recognized that a police viewing of items following a search by a private citizen does not constitute a search within the meaning of the Fourth Amendment as long as the view is confined to the scope and product of the initial private search. (275 F.3d at pp. 458–459.)

■ The *Runyan* court went on to explain, however, that "*Jacobsen*[, *supra*, 466 U.S. at page 120] emphasized that the police's actions in that case were unproblematic from a Fourth Amendment perspective because their actions 'enabled . . . [them] to learn nothing that had not previously been learned during the private search.' [Citation.] Thus, under *Jacobsen*, confirmation of prior knowledge does not constitute exceeding the scope of a private search.

In the context of a search involving a number of closed containers, this suggests that opening a container that was not opened by private searchers would not necessarily be problematic if the police knew with substantial certainty, based on the statements of the private searchers, their replication of the private search, and their expertise, what they would find inside. Such an 'expansion' of the private search provides the police with no additional knowledge that they did not already obtain from the underlying private search and frustrates no expectation of privacy that has not already been frustrated." (*U.S. v. Runyan, supra*, 275 F.3d at p. 463.)

The *Runyan* court continued as follows: "The guideline that emerges from the above analysis is that the police exceed the scope of a prior private search when they examine a closed container that was not opened by the private searchers unless the police are already substantially certain of what is inside that container based on the statements of the private searchers, their replication of the private search, and their expertise. This guideline is sensible because it preserves the competing objectives underlying the Fourth Amendment's protections against warrantless police searches. A defendant's expectation of privacy with respect to a container unopened by the private searchers is preserved unless the defendant's expectation of privacy in the contents of the container has already been frustrated because the contents were rendered obvious by the private search. Moreover, this rule discourages police from going on 'fishing expeditions' by opening closed containers. Any evidence that police obtain from a closed container that was unopened by prior private searches will be suppressed unless they can demonstrate to a reviewing court that an exception to the exclusionary rule is warranted because they were substantially certain of the contents of the container before they opened it.

"Applying this guideline to the facts of the instant case reveals that the police's pre-warrant examination of the disks clearly exceeded the scope of the private search. The police could not have concluded with substantial certainty that all of the disks contained child pornography based on knowledge obtained from the private searchers, information in plain view, or their own expertise. There was nothing on the outside of any disk indicating its contents. Moreover, [the wife]'s testimony at the suppression hearing reveals that she did not know the contents of the disks that she turned over, apart from the particular samples that she and [her friend] had examined. . . . The mere fact that the disks that [the private searchers] did not examine were found in the same location in Runyan's residence as the disks they did examine is insufficient to establish with substantial certainty that all of the storage media in question contained child pornography.

"Thus, the police exceeded the scope of the private search in the instant case when they examined disks that the private searchers did not examine."[6] (*U.S. v. Runyan, supra*, 275 F.3d at pp. 463–464, fn. omitted.)

Initially, we agree with defendant's argument (unchallenged by the People) that the compact discs constituted closed containers, the contents of which were not apparent on their face. Under the foregoing authorities, to the extent Officer Walker viewed images on the compact discs that Sadler had already viewed, his search was within the scope of the private search and did not implicate the Fourth Amendment.

Defendant contends it cannot be determined which images on which compact discs Sadler viewed before Officer Walker returned to the apartment and whether they were the same as the images and discs Sadler initially showed Officer Walker. Defendant also argues that Officer Walker made no effort to ensure that he was limiting himself to the scope of the private search. While this latter point may be true, Sadler testified that during Officer Walker's absence, he viewed a number of compact discs (not just two, as defendant asserts) containing images of himself and Schultze, and when Officer Walker returned, Sadler "showed him the images that I had already found and looked at." Moreover, although Sadler said he "picked a random one," we disagree with defendant's interpretation of this comment as suggesting it was a disc Sadler had not previously viewed. Even when Officer Walker expressed a need for something more (something with "the real thing on it because that's going to make or break everything"), Sadler responded: "I can do that. The one that we saw is right here."

Based on the foregoing evidence, we conclude Officer Walker's initial viewing of the compact discs—which disclosed sufficient evidence of a crime—was within the scope of the private search Sadler had previously conducted. We also conclude, however, that—contrary to the trial court's finding—Officer Walker impermissibly exceeded the scope of the private search by directing Sadler to keep looking. When Sadler asked if he could "look through more of them to see if there's sexual [content]," Officer Walker replied, "Yeah, yeah, yeah." Sadler also testified that when Officer Walker "said that he would need more explicit images of [Schultze and him] having

---

[6] The *Runyan* court also concluded the police did not exceed the scope of the private search when they examined more files on each of the discs than did the private searchers. (*U.S. v. Runyan, supra*, 275 F.3d at p. 464 [once a container is opened, the expectation of privacy in its contents has already been compromised].) At least one commentator has criticized *Runyan* on this point. (2 LaFave, Criminal Procedure (3d ed. 2007) § 3.1(h), p. 44.) We need not address this point here because the evidence does not establish which compact discs Sadler viewed in his private search.

sexual intercourse," Sadler "looked through approximately probably seven to ten more CDs to find" images of Schultze and him having sexual intercourse, which he then showed to Officer Walker. According to Sadler, he showed Officer Walker "probably three to four of the" discs that contained "files of—of [Schultze] and [him] completely naked and doing sexual things."

The People argue there was no expansion of the private search because the additional images Officer Walker viewed were just "more evidence of the same crimes" and therefore did not harm defendant. As in *Runyan*, however, neither the police (Officer Walker) nor the private searcher (Sadler) could have had a substantial certainty about the contents of any of the 36 compact discs taken from defendant's room. The discs on their face did not indicate their contents. The fact that the discs not previously viewed by Sadler were found in the same location (defendant's room) as the discs Sadler did examine was insufficient to establish the requisite substantial certainty. (*U.S. v. Runyan, supra*, 275 F.3d at p. 464.)

We thus conclude that, as to any compact discs not viewed during the private search, Officer Walker's subsequent viewing of images on those discs, which Sadler showed Officer Walker at his direction, constituted a warrantless government search triggering the Fourth Amendment. The People offer no legal justification for that warrantless search. Accordingly, contrary to the trial court's conclusion, an illegal search did occur in this case.[7]

## VI

### *Detective Vigon's Viewing of Images from the Compact Discs*

Detective Vigon testified he viewed images from "several" discs, which consisted of Sadler and Schultze "just sitting around watching TV to actually having sex." There is no evidence in the record, however, as to exactly what discs he viewed or whether those discs were ones that Sadler had already viewed in his private search. As a result, it is impossible to determine whether Detective Vigon's viewing of the compact discs exceeded the scope of the private search. Because the People failed to show that Detective Vigon's viewing was limited to discs that had been previously viewed during

---

[7] At oral argument, the People conceded that the trial court's rationale for finding the search lawful was erroneous.

the private search, we conclude that Detective Vigon's viewing of the discs was an illegal search also.

## VII

### *The Trial Court Must Determine What Evidence, If Any, Is Subject to Suppression As a Result of the Illegal Searches*

The People contend that the Fourth Amendment violations do not require suppression of the evidence because defendant's "confession and subsequent consent to [the] search [of his room] were not based upon the exploitation of any illegally obtained evidence." Although the issues of whether the Fourth Amendment violations tainted defendant's confession and his consent to search and whether any evidence was subject to inevitable discovery were raised in the trial court, the trial court never reached those issues because the trial court ruled that no Fourth Amendment violation occurred. Because the trial court never reached those issues, the court never made any of the factual findings necessary to resolve those issues, including (1) what the police learned lawfully from Sadler without looking at discs Sadler had not previously viewed; (2) whether Detective Vigon communicated to defendant anything more than what the police had lawfully learned (so that defendant's confession and consent to search were not the product of an illegal search); and (3) whether the confession and consent to search were voluntary and inevitably would have resulted in seizure of discs that Sadler had not viewed.

Absent such factual findings, we cannot decide whether defendant's confession and consent to search were tainted by the illegal searches that occurred here, or whether the doctrine of inevitable discovery applies to any of the evidence sought to be admitted. Therefore, we shall reverse the judgment and remand the matter to the trial court to permit it to finish the analysis it would have performed if the court had concluded—as we do—that there was a Fourth Amendment violation in the police viewing of discs that Sadler had not previously viewed. The analysis must be completed on the record already established, i.e., the People may not introduce additional evidence or tender a new theory not raised at the original suppression hearing. (See *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 640 [108 Cal.Rptr. 585, 511 P.2d 33].) Thus, the trial court shall (1) allow defendant to withdraw his no contest plea; (2) reinstate the dismissed charges against him (assuming he chooses to withdraw his plea); and (3) decide, consistent with this opinion, what evidence, if any, must be suppressed. If defendant chooses not to withdraw his plea, the trial court shall reinstate the judgment.

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

Scotland, P. J., and Sims, J., concurred.