Filed 11/6/20 (unmodified opn. attached)
CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D074992 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD263466) |
| LUKE NOEL WILSON, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Appellant. | |
| | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on October 21, 2020, be

modified as follows:

On page 50, the sentence beginning, "As Wilson concedes on appeal," is

deleted and the following sentence is inserted in its place:

> As Wilson concedes on appeal, his counsel objected to some,
> but not all, of these allegedly improper acts by the
> prosecution.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

McCONNELL, P. J.

Copies to:  All parties

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LUKE NOEL WILSON,<br><br>    Defendant and Appellant. | D074992<br><br><br><br>(Super. Ct. No. SCD263466) |

APPEAL from a judgment of the Superior Court of San Diego County, Esteban Hernandez, Judge.  Affirmed.

Charles M. Sevilla, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

After the trial court denied his pretrial motion to suppress evidence obtained without a warrant, a jury convicted Luke Noel Wilson of one count of oral copulation of a child 10 years or younger (Pen. Code, § 288.7,

subd. (b))[1] and three counts of committing a lewd act upon a child (§ 288, subd. (a)), further finding true the allegations that two counts were committed against more than one victim.  (§ 667.61, subds. (b), (c), and (e).)  The court sentenced Wilson to an indeterminate prison term of 45 years to life.

Wilson appeals, contending (1) the trial court erred in denying his motion to suppress; (2) the evidence was insufficient to support his convictions under section 288, subdivision (a); (3) he was denied his due process right to notice of the nature of the charges against him; (4) the prosecution knowingly introduced false evidence at trial; (5) the prosecution failed to produce exculpatory evidence before trial in violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*); (6) the trial court's jury instructions and answers to jury questions were incomplete, misstated the law, and were unduly prejudicial; (7) prosecutorial misconduct and the court's failure to address the misconduct denied him his right to a fair trial; (8) the mandatory sentence was cruel and/or unusual as applied to Wilson; and (9) cumulative error.  We conclude Wilson's contentions lack merit.  Accordingly, we affirm the judgment.

FACTUAL BACKGROUND

For purposes of this section, we state the evidence in the light most favorable to the judgment.  (See *People v. Osband* (1996) 13 Cal.4th 622, 690; *People v. Dawkins* (2014) 230 Cal.App.4th 991, 994.)  Additional facts will be discussed where relevant in the following sections.

Using a website where women posted photos with the hopes of finding modeling and acting jobs, Wilson contacted an 18-year-old woman and hired

---

1  All further statutory references are to the Penal Code unless otherwise specified.

her to pose for a photo shoot.  The woman was fully clothed in the initial photo shoot, but over time Wilson persuaded her to first pose partially nude and, eventually, fully nude in hotel rooms after plying her with alcohol and paying her to pose.

The woman later introduced Wilson to her younger sister, J.A., who was only 15 years old at the time.  Wilson paid the two sisters to pose, fully clothed, for photographs together in Balboa Park.

At the Balboa Park photo shoot, Wilson asked J.A. for her phone number and began contacting her separately from her sister.  J.A. later agreed to another photo shoot, this time in a hotel room in lingerie.  Thereafter, Wilson continued to send her "proposals" via e-mail, text message, or a texting "app" for photo shoots, detailing how much he would pay her to pose in certain ways.  Over time, but while she was still a minor, Wilson progressed to paying J.A. to pose for nude and sexually explicit photos.  Providing J.A. with alcohol to get her "more settled and calm," Wilson eventually paid J.A. to let him film her while he performed sexual acts and while she used sex toys on herself or allowed him to use the same toys on her body.  These "photo shoots" occurred when J.A. was 15 or 16 years old.  After the photo shoots, Wilson sent the photos to J.A., who testified that she liked the way she looked in the photos.  By the time J.A. was 16 or 17 years old, Wilson was paying her to have sexual intercourse with him while he filmed the encounter.  Occasionally, during photo shoots, Wilson would show J.A. child pornography.

When J.A. was 17, she became pregnant with her boyfriend (not Wilson).  She gave birth to her daughter in late 2013, after she turned 18 and shortly after her high school graduation.

J.A. continued to do photo shoots with Wilson while she was pregnant. The photo shoots with Wilson, including nude photo shoots and filming during sexual acts, also continued after J.A. gave birth to her daughter. Around the same time, J.A. lost her job and was no longer working. She continued to accept payments from Wilson to perform in photo shoots, explaining that she could make the same amount of money in exchange for one photo shoot that she would earn working for two weeks at her previous part-time job.

Wilson later paid J.A. to send him a video of her having sex with her boyfriend. Over time, Wilson progressed to suggesting a proposal of paying J.A. to take photos of her touching her infant daughter. When her daughter was about nine months old, J.A. accepted a proposal from Wilson to pay her to take a photo with her hand on her daughter's buttocks and send it to him. Thereafter, Wilson offered to pay J.A. to send him photos or videos showing her orally copulating her daughter. J.A. again accepted the proposal and sent Wilson a minute-long video.

Wilson was also aware that J.A. often babysat her young cousin. Wilson began making offers to J.A. for her to touch her cousin in exchange for several hundred dollars. When the girl was about five years old, J.A. agreed to do so, sending Wilson photos of her touching her cousin's bare buttocks.

J.A. admitted to knowing at the time that what she was doing was wrong. Despite this knowledge, she continued to communicate regularly with Wilson without expressing any opposition. She admitted she never contacted the police, even after Wilson escalated to asking J.A. to perform and film sexual acts on minors. Instead of objecting, J.A. reacted with enthusiasm, responding to his proposals with e-mails full of exclamation points and frequently used the slang "lol," meaning "laugh[ing] out loud," in response to

4

his extreme proposals. When Wilson asked her to perform oral copulation on two other minor girls, J.A. responded that she would do it and suggested, "Let's do [it] ASAP lol." Later, Wilson sent her photographs of a young girl that he wanted J.A. to perform with, to which J.A. responded "Lol aw she's soo small and cute lol."[2]

Several months later, J.A. declined Wilson's offers for additional photos of the young girls, claiming she felt guilty and was no longer comfortable with the idea. However, J.A. continued to communicate with Wilson up to the date of her arrest and participated in solo photo shoots for him.

In August 2015, J.A. was contacted by federal law enforcement and initially denied knowing Wilson or participating in his photo shoots. When confronted with the photos of her daughter, J.A. admitted the truth and began cooperating.

J.A. was initially charged with multiple offenses, but accepted a plea agreement wherein she pleaded guilty to four counts of felony child abuse (§ 273a, subd. (a)) and was sentenced to 10 years of probation.

As detailed *ante*, part of Wilson's course of conduct included offering to pay for photographs depicting lewd acts with minors, receiving the resulting photographs, and then distributing those photographs. Wilson used his "Gmail" e-mail account, hosted by Google, to communicate with the women. The Google Terms of Service specify that users may only use the Google

---

[2] The record suggests J.A. never completed these acts involving girls other than her daughter and her cousin despite her willingness to do so.

5

services as "permitted by law."[3] Google informs users that it "may review content to determine whether it is illegal or violates our policies, and we may remove or refuse to display content that we reasonably believe violates our policies or the law. But that does not necessarily mean that we review content, so please don't assume that we do."

Google, on its own initiative, took steps to ensure its systems were free of illegal content, particularly child sexual abuse material. Since 2008, Google has used a screening process utilizing a proprietary "hashing" technology to identify apparent child sexual abuse images on its services. Trained Google employees use software to generate a "hash" value for any image file they find depicting child pornography. The hash value is generated by a computer algorithm and consists of a short alphanumeric sequence that is considered unique to the computer file.[4] (*Power of the Hash*, *supra*, 119 Harv. L.Rev.F. at p. 39.) The resulting hash values are then added to a repository. The repository therefore contains hash values, not the actual child pornography images.

When a user uploads new content to its services, Google automatically scans and generates hash values for the uploaded files and compares those hash values to all known hash values in the repository. If Google's system

---

[3]     In support of the People's opposition to the motion to suppress, a Google employee submitted a declaration with the Google Terms of Service attached as an exhibit. The record contains no indication of whether Wilson reviewed these terms or was otherwise aware of their content. We resolve this case without addressing the terms of service.

[4]     By way of example, the hash value for a file produced by Google in this case is "73500566f447032d5137a91e931204eb." Such a hash value is unique to the file, but cannot be " 'reversed' " to generate the contents of the file itself. (Salgado, *Fourth Amendment Search and the Power of the Hash* (2005) 119 Harv. L.Rev.F. 38, 40 (hereinafter *Power of the Hash*.)

detects a match between a hash value for uploaded content and a hash value in the repository for a file which was previously identified as containing apparent child pornography, the system generates a report to be sent to the National Center for Missing and Exploited Children (NCMEC) in the form of a "Cybertip."[5]  In some cases, Google sends the report without opening the image file, while in other cases a Google employee opens the image for manual review to confirm it contains apparent child pornography.

In June 2015, Google's system identified four image files, each with hash values matching values for apparent child pornography images in its repository, attached to an e-mail created by the Gmail account later identified as belonging to Wilson.[6]  Google generated a Cybertip report to NCMEC identifying and forwarding the four image attachments.  The report included only the four image files, not the e-mail body text or any other information specific to the e-mail.  Google classified the images, using a common categorization matrix, as "A1," indicating they depicted prepubescent minors engaged in sex acts.  The report reflected that a Google

_____

[5]      Under federal law, NCMEC is statutorily obligated to serve as a national clearinghouse and maintain a tip line for internet service providers to report suspected child sexual exploitation violations.  (See, e.g., *United States v. Ackerman* (10th Cir. 2016) 831 F.3d 1292, 1296 (*Ackerman*); 18 U.S.C. § 2258A(c).)  NCMEC is statutorily obligated to forward those reports, known as "Cybertips," to federal law enforcement and may, and often does, forward the reports to state and local law enforcement.  (*Ackerman*, at p. 1296.)

[6]      Although Google explains that its search is entirely voluntary and serves its own non-governmental interests, it has a duty under federal law to report apparent child pornography to the NCMEC once it obtains actual knowledge of such content.  (18 U.S.C. § 2258A, subd. (a).)

employee did not manually review the files after they were flagged using Google's hashing technology, and before sending them to NCMEC.

When it received the report from Google, NCMEC did not open or view the image files, but forwarded the report to the San Diego Internet Crimes Against Children (ICAC) task force after it determined the internet address associated with the Gmail account was in San Diego. The ICAC task force is an office comprised of individuals from multiple agencies, including the federal Department of Homeland Security and local law enforcement. When ICAC received the report, an administrative assistant with the San Diego Police Department printed the report with the attached electronic images, and provided them to two ICAC investigators. Those investigators viewed the images and determined the images warranted an investigation. An ICAC sergeant conducted his own review and agreed with that recommendation.

Using the information contained in the report and based on his review of the images, an ICAC investigator obtained a search warrant to obtain from Google all content and user information associated with the identified Gmail address. The investigator's affidavit establishing probable cause for the warrant was premised entirely on the investigator's viewing of the images and did not discuss Google's proprietary hash value technology, the underlying hash value match performed by Google, or even a general overview of this type of computerized matching system.

The warrant resulted in the discovery of Wilson's e-mails offering to pay J.A. to molest and exploit children. The investigator also reviewed e-mails in which Wilson distributed apparent child pornography to others.

Using the information received from Google and from Wilson's internet service provider to identify Wilson, the investigator then obtained a search warrant for Wilson's apartment and vehicle, and to seize computer

8

equipment, storage devices, and other effects. While executing the search warrant, a participating officer observed a backpack fall from Wilson's balcony. The officer retrieved the backpack, which held Wilson's checkbook and a thumb drive containing thousands of images of child pornography. Additional images were found on devices in Wilson's apartment.

Using information gleaned from Wilson's e-mails produced in response to the search warrant, the investigator was able to identify and locate the woman (J.A.) Wilson paid to perform the sex acts and send him some of the photographs. The investigator obtained additional warrants to search her residence and online accounts, leading to additional evidence used in Wilson's prosecution.

PROCEDURAL HISTORY

Before trial, Wilson filed a motion to suppress evidence pursuant to section 1538.5. Wilson argued the warrantless "search" of the e-mail attachments was illegal, requiring the suppression of those images and all evidence obtained indirectly from the initial warrantless search, including all of his e-mails, the e-mails of the woman who sent him the images, and the evidence recovered from his home.

At the hearing on the suppression motion, both parties stipulated to the admission as evidence of a declaration by a Google employee explaining Google's hashing and reporting process, that any testimony she would have offered would be the same as the contents of her declaration, and to the admission into evidence of the Google Terms of Service attached to her declaration. The parties also stipulated that Wilson had a subjective expectation of privacy in his e-mail account.

William Thompson, the ICAC investigator who reviewed Wilson's e-mail attachments and sought the search warrants, testified about his

9

investigation. Thompson acknowledged that neither Google nor NCMEC opened the image files attached to the e-mail. Thompson did not obtain a warrant before viewing the attachments.

Thompson also explained that in early 2017, ICAC changed its process relating to Cybertips with file attachments when the electronic service provider indicates it did not open the image files. Now, rather than immediately printing out the images and viewing them, the attached files are locked and ICAC first obtains a search warrant to view the attachments.

A computer forensic agent working for the Department of Homeland Security testified about the hashing process. He opined that it would be "almost inconceivable" for two files to have the same hash value if the files were not exactly the same. Using an example of one commonly-used hash value algorithm, he explained the odds of matching hash values for different files would be "something like 340 billion, billion, billion, billion to one."

The court denied the motion to suppress. As the court explained, "it appears that the crux of the motion is that the visual inspection of the images that were flagged by Google's proprietary hashing technology and whether or not it expanded beyond Google's private search and therefore would require a warrant of searching." The court found that Wilson had no reasonable expectation of privacy in the use of an e-mail account with Google for "misconduct or unlawful conduct." The court explained that "bottom line when these kind of internet tools are used[,] [t]he tools have to be used in a lawful manner. And the terms of service alerts the users that Google may investigate this conduct or suspecting this conduct."

The court also found that no search under the Fourth Amendment occurred because law enforcement simply repeated the private search performed by Google. Acknowledging no employee at Google opened the file

10

to look at the photos, the court found the opening of the photos was not a significant expansion of Google's private search because "Google had previously confirmed that each of the four images in defendant's e-mail was child pornography. Special Agent Thompson already knew before visually examining the images, the court can reasonably infer from the A1 classification, that each of the four images depicted a prepubescent minor engaged in [a] sex act." Thus, the court concluded that the investigator was certain that he would not learn anything by opening the attachment that "had not previously been learned during the private search," such that opening the attachments and viewing the images did not constitute a search.

After the preliminary hearing, the district attorney filed an information charging appellant with four offenses. Count One, alleging a violation of section 288.7, subdivision (b) for the oral copulation of a child of 10 years old or younger, was premised on Wilson paying J.A. to orally copulate her daughter. Count Two alleged a violation of section 288, subdivision (a) for the lewd and lascivious touching of a minor arising from the same incident as Count One. Counts Three and Four also alleged violations of section 288, subdivision (a), and were premised on J.A.'s touching of her daughter's and cousin's buttocks on separate occasions. Counts Two, Three, and Four also alleged that Wilson committed the acts against more than one victim within the meaning of section 667.61, subdivisions (b), (c), and (e).

Following trial, the jury found Wilson guilty of all counts and found true the enhancement allegations pursuant to section 667.61, subdivisions (b), (c), and (e) as to two counts. The court denied Wilson's motion for new trial and sentenced Wilson to an indeterminate prison term of 45 years to life.

DISCUSSION

I

*Motion to Suppress:  Private Search Doctrine*

A.  *Standard of Review*

" 'In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence.  [Citation.]  We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment.' " (*Robey v. Superior Court* (2013) 56 Cal.4th 1218, 1223 (*Robey*).)  "Thus, while we ultimately exercise our independent judgment to determine the constitutional propriety of a search or seizure, we do so within the context of historical facts determined by the trial court." (*People v. Tully* (2012) 54 Cal.4th 952, 979.)

Here, the underlying facts surrounding the search were not in dispute. Thus, we exercise our independent judgment in answering whether the search was permissible under the Fourth Amendment.

B.  *Governing Law*

" 'The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." ' " (*Robey*, *supra*, 56 Cal.4th at p. 1224.)

But the Fourth Amendment does not apply to private searches. (*Burdeau v. McDowell* (1921) 256 U.S. 465, 475 [finding that the "origin and history [of the Fourth Amendment] clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to

12

be a limitation upon other than governmental agencies"]; *People v. North* (1981) 29 Cal.3d 509, 514 ["Historically, courts have consistently held that the Fourth Amendment's prohibition against unreasonable search and seizure does not apply to searches by private citizens."].)  Additionally, if a government search is preceded by a private search, the government search does not implicate the Fourth Amendment as long as it does not exceed the scope of the initial private search.  (*United States v. Jacobsen* (1984) 466 U.S. 109, 115-117 (*Jacobsen*); see *Walter v. United States* (1980) 447 U.S. 649, 657 (*Walter*).)[7]

The parameters of this private search doctrine—relied upon by the Attorney General here—were discussed by the United States Supreme Court in *Jacobsen.*  In that case, FedEx employees opened a package which had been damaged in transit.  (*Jacobsen*, *supra*, 466 U.S. at p. 111.)  The employees inspected the torn package, removed and cut open a tube found inside, and discovered plastic bags containing a suspicious white powdery substance.  (*Id.* at pp. 111, 115.)  The employees repackaged the shipment's contents and contacted federal law enforcement agents with the Drug Enforcement Administration (DEA).  (*Id.* at pp. 111-112.)  The agents inspected the partially open container, removed the contents, opened the plastic bags, and removed a small quantity of the powder to perform a field chemical test, which identified the substance as cocaine.  (*Ibid.*)

---

7     "Although the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative, the Amendment protects against such intrusions if the private party acted as an instrument or agent of the Government." (*Skinner v. Ry. Labor Execs. Ass'n* (1989) 489 U.S. 602, 614.)  No argument has been made that Google was an "instrument or agent" of the government here.

The defendant challenged the agents' opening of the package and testing of the powder as a warrantless search in violation of his Fourth Amendment rights. (*Jacobsen*, *supra*, 466 U.S. at p. 112.) In concluding no Fourth Amendment violation occurred, the Supreme Court first explained that the private search conducted by the FedEx employees did not implicate the Fourth Amendment. (*Id.* at p. 115 ["Whether [the initial invasions by the FedEx employees] were accidental or deliberate, and whether they were reasonable or unreasonable, they did not violate the Fourth Amendment because of their private character."], fn. omitted.) The Court then explained that "[t]he additional invasions of [the defendant's] privacy by the [g]overnment agent must be tested by the degree to which they exceeded the scope of the private search." (*Ibid.*) The Court reasoned that "[o]nce frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now nonprivate information," and "[t]he Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." (*Id.* at p. 117.)

Applying these principles, the Court held that the government's actions—in examining and then later testing the white powder—did not violate the Fourth Amendment. Since the agent's "removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search," the Court held it "infringed no legitimate expectation of privacy and hence was not a 'search' within the meaning of the Fourth Amendment." (*Jacobsen*, *supra*, 466 U.S. at p. 120.) The Court observed that, even though the white powder was not in plain view because it was still enclosed in some packaging, "there was a virtual certainty that nothing else

14

of significance was in the package and that a manual inspection of the tube and its contents would not tell [the agent] anything more than he already had been told" by the FedEx employees. (*Id*. at p. 119.) In other words, the government's actions merely confirmed the FedEx employees' recollection concerning the contents of the package. (*Ibid*.) "The advantage the [g]overnment gained thereby was merely avoiding the risk of a flaw in the employees' recollection, rather than in further infringing respondents' privacy. Protecting the risk of misdescription hardly enhances any legitimate privacy interest, and is not protected by the Fourth Amendment." (*Ibid*.)

Similarly, with respect to the field test, the Court held that testing the substance did not violate the Fourth Amendment because a "chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy," and therefore does not constitute a search. (*Jacobsen*, *supra*, 466 U.S. at p. 123.) As the Court explained: "Congress has decided—and there is no question about its power to do so—to treat the interest in 'privately' possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably 'private' fact, compromises no legitimate privacy interest." (*Ibid*.) The Court concluded that "the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment."[8] (*Id*. at p. 124.)

---

[8] The Court compared the government's field testing to the government's canine sniff of luggage in *United States v. Place* (1983) 462 U.S. 696, 707, which was held not to be a search because a sniff can disclose only the presence or absence of contraband. (*Jacobsen*, *supra*, 466 U.S. at pp. 123-124.)

15

C. *Application of the Private Search Doctrine*

Wilson contends the private search doctrine does not apply here and, even if it does, the government "far exceeded the scope of Google's automated hash match." Applying the principles set forth in *Jacobsen*, we reject Wilson's claims and conclude the government's actions did not violate the Fourth Amendment.

We begin by examining Google's actions. To summarize, Google has a team of employees who are trained on how to recognize child pornography and, since 2008, Google has used a computerized "hashing technology" to assist in this process. At least one Google employee reviews an offending child pornography image before it is assigned a unique hash value, or a "digital fingerprint," that is then stored in Google's repository of hash values. Google then scans all user content uploaded to its services and compares the content to the repository of hash values to identify any duplicate images of apparent child pornography as defined under 18 U.S.C. section 2256. Other users can also flag suspicious content and bring it to Google's attention, but "[n]o hash is added to [Google's] repository without the corresponding image first having been visually confirmed by a Google employee to be apparent child pornography." When this process yields a match in hash values—i.e., the hash value of a user's content matches a hash value corresponding with child pornography viewed by Google and stored in its repository—Google prepares a report to send to NCMEC. In some cases, a Google employee manually looks at the user content. In other cases, Google reports the user to NCMEC without again viewing the image whose hash value matches a hash value in its repository.

In this case, Wilson uploaded four offending images (photographs) using Google's services. Utilizing its scanning process and specifically its

16

"hashing technology," Google determined that the content constituted child pornography and classified the content as "A1," indicating "that the content contained a depiction of prepubescent minor engaged in a sexual act." Google submitted a report, along with the four photographs, to NCMEC. It did not include "any email body text or header information associated with the reported content." As in other cases where a Google employee has already reviewed an offending image in the past, in this case a Google employee did not re-review Wilson's photographs concurrently to submitting the report to NCMEC. Google also did not review the content of the e-mail message to which the images were attached. Around the same time that it submitted the report to NCMEC, Google terminated Wilson's account.

All of Google's actions—including scanning user content, assigning hash values to that content, comparing user content to a repository of hash values, flagging offending images with hash values that match previously-reviewed child pornography images, and sending the apparent child pornography to NCMEC—constitute private action that was not performed at the direction of the government.[9] The Fourth Amendment's protection "is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the [g]overnment or with the participation or knowledge of any governmental official.' " (*Jacobsen*, *supra*, 466 U.S. at pp. 113-114.) As such, no violation of the Fourth Amendment occurred as a result of Google's private actions.

---

[9] Google was not aware of any investigation involving Wilson prior to submitting its report to NCMEC. As previously indicated, Wilson does not contend that Google or NCMEC were acting as governmental agents in this case.

The government's subsequent actions—consisting of opening the electronic files submitted to it by NCMEC and viewing the four images attached to Google's Cybertip—did not exactly replicate Google's private actions. Applying *Jacobsen*, we therefore consider the *degree* to which the agent's additional invasions of Wilson's privacy exceeded the scope of Google's private search. (*Jacobsen*, *supra*, 466 U.S. at p. 115.) Before the government even received Wilson's photographs, Google had already reviewed identical images in the past; scanned all of Wilson's electronic communications to search for content with matching hash values; flagged four of Wilson's images as matching images Google had previously observed; classified the matching images as A1, indicating they depicted prepubescent minors engaged in sexual acts; forwarded all four images to NCMEC as part of a Cybertip report; and terminated Wilson's account. As the Court explained in *Jacobsen*, "[t]he Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." (*Id*. at p. 117.) Because Google's actions, outlined above, frustrated any expectation of privacy Wilson possessed in the four photographs at issue, the government was free to use this now nonprivate information without violating the Fourth Amendment. (*Ibid*.)[10] No privacy interest remained in the four images following the private search by Google.

The agent in this case did not violate the Fourth Amendment when he opened and viewed the four photographs, just as the government did not violate the Fourth Amendment when it examined and later tested the white

[10] We assume without deciding that Wilson had a legitimate expectation of privacy in the computer images at issue under the Fourth Amendment. We do not need to address the question of whether Google's terms of service negated any reasonable expectation of privacy.

18

powder in *Jacobsen*. The DEA agent's removal of the plastic bags and his visual inspection of their contents in *Jacobsen* enabled him to "learn nothing that had not previously been learned during the private search." (*Jacobsen*, *supra*, 466 U.S. at p. 120.) Based on the FedEx employees' testimony, it was virtually certain that the package contained nothing else of significance that the agents had not already learned from the private employees. The government was merely confirming the FedEx employees' account regarding the suspected contents of the package. (*Id*. at p. 119.) Similarly, in this case, opening and viewing the four photographs merely enabled the government to confirm what Google had already conveyed through the Cybertip it generated after using its hashing technology—that the four images were suspected of constituting child pornography. The government did not further infringe on Wilson's privacy, but rather guarded against the risk that Google's report was wrong. (*Ibid*.)

We acknowledge this case differs from *Jacobsen* insofar as the technology and procedures that were used by the parties. Unlike *Jacobsen*, where the FedEx employees visually observed and handed over the same white substance that was later tested by the government, in this case a Google employee did not contemporaneously view Wilson's four photographs before sending them to NCMEC. But we conclude *Jacobsen* still applies despite these differences resulting from the use of Google's hashing technology. A Google employee *did review* identical user content—which matched each of Wilson's four images—although this review occurred at some point in the past rather than contemporaneously with the Cybertip report. A "digital fingerprint" was assigned to each of the four images, meaning that Wilson's four images were identical to those in Google's repository of hash values, and no hash values are stored in Google's repository unless at least

19

one Google employee has viewed the content and confirmed it constitutes apparent child pornography.[11]  Google did not turn over anything else other than the discrete set of four matching images attached to the Cybertip report; it did not include any larger "files" from which the images were extracted (if any) and it did not include any e-mail body text or header information associated with any of Wilson's files.  (Cf. *Ackerman*, *supra*, 831 F.3d at pp. 1305-1306 [government agent expanded AOL's private party search because, in addition to opening the attachment that had been flagged as having a matching hash value, it also opened an e-mail and three other attachments that AOL had not opened or processed through its hash value system].)  The government was merely reviewing what Google had already found, but in a different format—visually reviewing the photographs with the agent's human eyes versus replicating the computer's generation of a numerical algorithm.  Because the assigned numerical values, or "digital fingerprints," are representative of the contents depicted in the photographs themselves, the government gained no new material information by viewing

---

[11]     Google explains that a comparison of these "digital fingerprints" allows it "to identify *duplicate* images of apparent child pornography to prevent them from continuing to circulate on [its] products."  (Italics added.)  Other courts and commentators similarly describe hash matching as a highly accurate technology.  (See, e.g., *United States v. Reddick* (5th Cir. 2018) 900 F.3d 636, 639 (*Reddick*) ["[H]ash value comparison 'allows law enforcement to identify child pornography with almost absolute certainty.' "]; *Power of the Hash*, *supra*, 119 Harv. L.Rev.F. at p. 39 [explaining hash algorithms are designed to be "uniquely associated with the input," such that no two files will have matching values "except a file that is identical, bit-for-bit"].)

the images. The agent merely confirmed Google's report that Wilson uploaded content constituting apparent child pornography.[12]

In sum, the government's warrantless search of Wilson's four images was permissible under the private search doctrine. Google's private search frustrated Wilson's expectation of privacy in the files before they were viewed by the government. Google had already identified Wilson's files as having matching hash values to images that had previously been viewed and identified by a Google employee as apparent child pornography. The government's subsequent opening and viewing of the four photographs did not significantly expand on the search that had previously been conducted by Google. The agent's actions in opening the files and viewing the images merely confirmed that the flagged files were child pornography, as reflected in Google's Cybertip report.

D. *Defendant's Arguments Regarding the Private Search Doctrine*

Wilson's arguments against application of the private search doctrine are not persuasive. We address these arguments in turn.

---

[12] As previously noted, *Jacobsen* also separately discussed the government's field test—concluding the testing of the white substance did not constitute a search within the meaning of the Fourth Amendment. (*Jacobsen, supra,* 466 U.S. at pp. 122-123.) Because the same cannot be said for the agent's actions in opening and viewing Wilson's digital images (i.e., these actions do constitute a search), this part of the *Jacobsen* decision does not directly apply here. To the extent it does apply, the Court's reasoning further supports our conclusion that the government did not violate Wilson's Fourth Amendment rights. Just as the chemical test could reveal whether the substance was cocaine, and no other arguably private fact, the agent's visual observations here merely confirmed the presence or absence of suspected child pornography. The fact that the confirmation occurred through the use of the agent's own eyes in this case, versus the chemical testing in *Jacobsen,* does not make the private search doctrine inapplicable.

21

Wilson contends the private search doctrine does not apply at all because Google's use of its hashing technology does not "qualify as a private search under the Fourth Amendment." Wilson reasons that only humans can frustrate one another's reasonable expectations of privacy and, because Google's hashing process is automated and no human looked at Wilson's e-mail attachments until the agents did, no private search occurred at all and Wilson's privacy interests remained intact. We reject Wilson's narrow view of the process employed by Google here. Wilson's assertion that "[n]o human looked at [his] email attachments until the agents did," and his related claim that Google employed a "machine scan with no human involvement," does not accurately account for the multi-step process used by Google here. A computer program was used, but it did not occur without "human involvement" or "human participation." As already discussed, Google trains employees who are responsible for identifying child pornography on its systems. No image is assigned a hash value and added to Google's repository of hash values associated with apparent child pornography unless an employee first looks at the actual image and confirms its contents. If someone uploads content that is scanned and determined to have a matching hash value, a Google employee then takes that flagged image and submits it to NCMEC in the form of a Cybertip. In addition to flagging the file as suspected child pornography based on its matching hash value, Google classifies the file's contents based on the initial employee review of an identical duplicate image. In some cases, a Google employee looks at the duplicate image before sending it to NCMEC. But in other cases, as here, a Google employee does not perform this redundant step. In either case, Google's actions in reviewing, scanning, and flagging user content—and assigning hash values to users' files—are properly viewed in their entirety as

22

equivalent to a private search which frustrated any reasonable expectation of privacy in the subject files.  (See *Reddick*, *supra*, 900 F.3d at p. 637 [a private company's determination, using an automated computer program, that the hash values of defendant's uploaded files corresponded to the hash values of known child pornography images, constituted a private search for Fourth Amendment purposes].)[13]

Citing *Riley v. California* (2014) 573 U.S. 373 and *Carpenter v. United States* (2018) 138 S.Ct. 2206, Wilson next contends that the United States Supreme Court is unwilling to "extend established Fourth Amendment doctrines in the face of technological innovations that permit greater privacy intrusions."  In *Riley*, the Supreme Court held that a warrant is generally required before the police may search an arrestee's cell phone incident to arrest.  (*Riley*, at p. 401.)  In *Carpenter*, the Court held that the Fourth Amendment required a warrant for the automated search of historical cell site location information covering an extended period of time.  (*Carpenter*, at pp. 2217, 2221.)  Both cases referenced privacy concerns implicated by emerging technology.  (See *Riley*, at pp. 393-395 [explaining that cell phones have an "immense storage capacity," which allows people to carry a "cache of sensitive personal information" with them]; *Carpenter*, at p. 2220 [explaining that, with cell site location information technology, the wireless carrier holds a "detailed chronicle of a person's physical presence compiled every day, every moment, over several years"].)  But neither case assists Wilson here.  The

_____

13    Had the government itself engaged in this type of expansive review of user content (and in particular, a user's e-mails) without a warrant, there is little doubt it would be considered a search under the Fourth Amendment. (See *United States v. Warshak* (6th Cir. 2010) 631 F.3d 266, 285-286 [applying Fourth Amendment protection to e-mail contents]; see also *Kyllo v. United States* (2001) 533 U.S. 27, 40 [concluding that the use of a thermal imaging technology constituted an unlawful search].)

present case does not involve the government's use of technological advancements which pose a threat to a defendant's Fourth Amendment rights. It involves a private search which does not implicate the Fourth Amendment at all. Even if we assume these cases suggest caution in applying the private search doctrine to digital devices such as cell phones or computers, we are not faced with that situation here. The government did not review evidence located on these types of devices. Google did not, for example, provide the government with access to all of Wilson's electronic communications on his computer. Instead, the government viewed four discrete photographs that were attached to Google's Cybertip. Wilson's reliance on *Riley* and *Carpenter* is misplaced here.

Wilson further contends the agent here significantly expanded on Google's search. Wilson relies on the United States Supreme Court's decision in *Walter*, and contends *Jacobsen* is inapposite. We disagree. In *Walter*, a private party mistakenly received a shipment containing several individual boxes of films with labels on the outside indicating the films contained obscene content. (*Walter*, *supra*, 447 U.S. at pp. 651-652 [explaining "one side of [the examined boxes contained] suggestive drawings, and on the other side were explicit descriptions of the contents"].) After one of the employees unsuccessfully attempted to view the films' contents, the private party contacted the Federal Bureau of Investigation (FBI) to retrieve the shipment. (*Id*. at p. 652.) The FBI agents viewed the films with a projector without obtaining a warrant. (*Ibid*.) In a plurality opinion, the Court held that the government's search violated the Fourth Amendment, explaining that "[t]he projection of the films was a significant expansion of the search that had been conducted previously by a private party." (*Id*. at pp. 657-658.)

Wilson contends Google's use of its hashing technology "was not materially different than reading the descriptive material on [the] film boxes" in *Walter*. This case is distinguishable. In *Walter*, prior to the FBI's screening of the films, the agents "could only draw inferences about what was on the films" based solely on the labels. (*Walter*, *supra*, 447 U.S. at p. 657.) The private party attempted to, but could not, view what was inside. (*Id*. at p. 652.) Here, the digital fingerprints associated with Wilson's files convey that the information in the four images is exactly the same as what was previously viewed by a Google employee. The hash value therefore is not like the labels or pictures on the boxes in *Walter*. The situation would be different, and *Walter* would likely control, if Google and the government here had relied on *file names* associated with the four images suggestive of child pornography. But Google's hashing technology employs a much more sophisticated, multi-tiered process, matching files on its services only against hash values for images that have already been identified as apparent child pornography by its employees. Unlike the private party in *Walter*, Google used a reliable and accurate method of identifying the actual contents of the files that were provided to the government—all four files were duplicates of images that a Google employee previously reviewed and identified as apparent child pornography.

Wilson also attempts to distinguish *Jacobsen* by pointing out that Google may have previously identified the subject images incorrectly: "a hash match involves origination subjectivity and does not provide a 'virtual certainty' that the suspect file is necessarily an image that has been previously correctly identified as child pornography." We are not persuaded by Wilson's attempt to distinguish *Jacobsen* on these grounds. There is no evidence in the record that Google's initial identification of apparent child

25

pornography, and the associated hash value calculation, was erroneous. Even if some level of subjectivity is involved when a Google employee identifies suspected child pornography, that does not mean the private search doctrine does not apply. The Court in *Jacobsen* made clear that the DEA agents could rely on the testimony of the FedEx employees, and that they could also confirm the employees' conclusions based on their private observations—and thereby guard against any errors or "flaw[s] in the employees' recollection"—by viewing the contents of the container themselves. (*Jacobsen*, *supra*, 466 U.S. at p. 119.) The private search doctrine does not require perfection in the information conveyed by a private party. Unlike *Walter*, the government relied on much more than a mere label in this case. Like *Jacobsen*, where "the suspicious nature of the material made it virtually certain that the substance tested was in fact contraband" (*id*. at p. 125), the suspicious nature of the images was evident based on Google's hashing technology. Before opening the four images, the government could not be one hundred percent certain the Google employee who previously viewed the four images was not mistaken about what was depicted in the pictures. But that possibility of error exists in all cases under the private search doctrine—there is some chance that the private party is conveying inaccurate information. In this case, however, it was reasonable for the government to conclude that the images were contraband based on the hashing process, the A1 designations associated with each of the four files, and the agent's own knowledge and training as a member of the ICAC task

26

force.[14] (Cf. *United States v. Runyan* (5th Cir. 2001) 275 F.3d 449, 463 [concluding that "police exceed the scope of a prior private search when they examine a closed container that was not opened by the private searchers unless the police are already substantially certain of what is inside that container based on the statements of the private searchers, their replication of the private search, and their expertise"].)

Wilson also cites *United States v. Keith* (D.Mass. 2013) 980 F.Supp.2d 33, which dealt with a similar hash matching process and concluded that NCMEC, acting as a government agent, expanded on a private search by opening and viewing electronic files forwarded to it by a private internet service provider. (*Id.* at pp. 41, 43.) The court concluded *Jacobsen* was inapposite because, in that case, "the subsequent DEA search provided no more information than had already been exposed by the initial FedEx search." (*Id.* at p. 43.) By contrast, the court reasoned that more information can be obtained from viewing a file's contents: "That is surely why a CyberTipline analyst opens the file to view it, because the actual viewing of the contents provides information additional to the information provided by the hash match." (*Ibid.*) But examining an item more closely and learning some additional details is not incompatible with applying the private search doctrine; the question is "the degree to which [the additional intrusions] exceeded the scope of the private search." (*Jacobsen, supra,* 466 U.S. at

---

14    Wilson also argues that "the hash match cannot provide the same virtual certainty as [the] chemical test" in *Jacobsen*, but that is not the proper benchmark because the private party in *Jacobsen* did not perform the chemical test. A more appropriate comparison would be to the FedEx employees' visual observations of the contents of the container and the white substance. Google's extensive hash matching process provides even more information than those visual observations and inferences drawn from how the white substance was packaged.

p. 115.)  Moreover, the fact that the agent learned more from his review of the pictures compared to his review of the numerical algorithm is not dispositive because the proper question is whether this additional knowledge exceeded the scope of the private party's search.  As we have already discussed, the private party in this case *did* know all of the same details based on the prior visual review of the identical images by a Google employee and the government's search did not exceed the private search.  (See *Reddick*, *supra*, 900 F.3d at pp. 638-639 [a detective did not expand the scope of Microsoft's private search; applying *Jacobsen*, the court concluded that "opening the file merely confirmed that the flagged file was indeed child pornography, as suspected" after Microsoft scanned the defendant's files and determined the image file's hash value was identical to the hash value of known child pornography]; *United States v. Miller* (E.D. Ky. 2017) 2017 WL 2705963, at *7 ["Google's hash-value matching . . . does not reveal anything about an image that Google does not already know from the regular eyes of its employees.  Put another way, hashing is not a futuristic substitute for a private search—it is merely a sophisticated way of confirming that Google

already conducted a private search."].)[15]  In addition, in *Keith* and unlike here, it was not clear *who* performed the initial private search.  The court noted it was "possible that the hash value of a suspect file was initially generated by another provider and then shared with AOL." (*Keith*, at p. 37, fn. 2; see also *id*. at p. 43 ["the provenance of that designation [of the original file as child pornography] is unknown"].)  By contrast, "[n]o hash is added to [Google's] repository without the corresponding image first having been visually confirmed by a Google employee to be apparent child pornography."

Finally, Wilson contends he can establish a violation of his Fourth Amendment rights based on a trespass theory, irrespective of whether his privacy interests were invaded.  The government violates the Fourth Amendment by either infringing on a defendant's constitutionally protected expectation of privacy (*Katz v. United States* (1967) 389 U.S. 347, 351-353; *id*. at p. 361 (Harlan, J., concurring)), or by physically intruding (trespassing) on a defendant's property to obtain information (*United States v. Jones* (2012) 565 U.S. 400, 404-411).  But as previously discussed, it was a private party, not the government, who searched and seized Wilson's property.  The

---

[15]    Although the government could learn some details previously unknown to it, there is no likelihood that the government would learn something else of significance under the Fourth Amendment—i.e., a private fact in which a reasonable expectation of privacy remains—when it viewed the four images of child pornography following Google's extensive, multi-step hashing process. (Cf. *United States v. Lichtenberger* (6th Cir. 2015) 786 F.3d 478, 488-489 ["[N]ot only was there no virtual certainty that [the officer's] review [of a laptop computer] was limited to the photographs from [the private party's] earlier search, there was a very real possibility [the officer] exceeded the scope of [the private] search and that he could have discovered something *else* on [defendant's] laptop that was private, legal, and unrelated to the allegations prompting the search—precisely the sort of discovery the *Jacobsen* Court sought to avoid in articulating its beyond-the-scope test."], italics added.)

29

government merely viewed what the private party had turned over through a private Cybertip. The Fourth Amendment only prohibits governmental action. Wilson provides no sound basis for finding a Fourth Amendment violation under these circumstances, even if Google's search can be characterized as an unlawful trespass, a physical intrusion on defendant's property interests, or any other type of wrongful conduct. (See *Walter*, *supra*, 447 U.S. at p. 656 ["a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and . . . such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully"]; *Jacobsen, supra*, 466 U.S. at pp. 114, 119 [finding that the DEA agent's "viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment," even though the private actor's conduct "might have been impermissible for a government agent"]; *People v. Otto* (1992) 2 Cal.4th 1088, 1112 [the exclusionary rule "does not preclude the state from using the fruits of illegal searches and seizures by private citizens"]; *People v. Wilkinson* (2008) 163 Cal.App.4th 1554, 1564 ["[t]he Fourth Amendment's prohibition against unreasonable searches and seizures does not apply to searches by private citizens, even if the private citizens act unlawfully, unless the private citizen can be said to be acting as an agent for the government"].)

## II.

### *Sufficiency of the Evidence: Section 288(a)*

Wilson contends the evidence does not support the jury's verdict finding him guilty of Counts Two, Three, and Four, for which he was charged with aiding and abetting, or conspiring to commit, J.A.'s lewd and lascivious acts on her daughter and cousin in violation of section 288, subdivision (a) because J.A. did not harbor the requisite sexual intent. We disagree.

30

"Our task is clear. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Both parties agree that for the jury to convict Wilson of committing lewd and lascivious acts on a child under the age of 14 on the theory that he aided or abetted, or conspired with, J.A. when she committed those acts, the jury was required to find that J.A., as the principal perpetrator, touched the children "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of [herself] or the child." (§ 288, subd. (a).) This element is the only element which Wilson contends was not supported by sufficient evidence.

For purposes of this appeal, Wilson does not contend that J.A. did not touch the children, but only that the evidence did not support the jury's

31

conclusion that she did so with the requisite intent.  Wilson argues J.A. did not lust after her infant daughter and young cousin and touch them with the aim of satisfying her own sexual desires, but rather that the evidence established that she touched the children only because Wilson paid her to do so and she was desperate for money.

"Regarding a specific intent element of a crime, [our Supreme Court has] explained that '[e]vidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.'  [Citation.]  Moreover, the standard of review that applies to insufficient evidence claims involving circumstantial evidence is the same as the standard of review that applies to claims involving direct evidence.  'We "must accept logical inferences that the jury might have drawn from the circumstantial evidence.  [Citation.]"  [Citation.]  "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt.  [Citation.]"  [Citation.]  Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

To sustain a conviction under section 288, subdivision (a), the prosecution must present evidence regarding the intent of the person touching the minor.  "As the vast majority of courts have long recognized, the only way to determine whether a particular touching is permitted or prohibited is by reference to the actor's intent as inferred from all the circumstances." (*People v. Martinez* (1995) 11 Cal.4th 434, 450.)  Convictions

32

under section 288, subdivision (a) "have been obtained and upheld only where the defendant's lustful intent was manifest under the particular circumstances. In all cases arising under the statute, the People are required to prove that the defendant touched the child in order to obtain immediate sexual gratification." (*Martinez*, at p. 452.) "Of course, the manner of touching is not irrelevant under this view. '[T]he trier of fact looks to all the circumstances, including the charged act, to determine whether it was performed with the required specific intent.' [Citations.] Other relevant factors can include the defendant's extrajudicial statements [citation], other acts of lewd conduct admitted or charged in the case [citations], the relationship of the parties [citation], and any coercion, bribery, or deceit used to obtain the victim's cooperation or avoid detection [citation]." (*Id*. at p. 445.)

With these principles in mind, we conclude the evidence supports Wilson's conviction on the theory that J.A. harbored the requisite sexual intent when she touched the girls. Viewed in the light most favorable to the prosecution, the evidence shows that J.A. touched the girls, including orally copulating her daughter, to satisfy her lust, passion, and sexual desire directed toward young girls. As she admitted, there was no medical reason for touching the girls. She also admitted she knew that what she was doing was "wrong" and that she "sinned" when she touched the girls, reasonably supporting the inference that she understood her feelings toward the girls were lewd and lascivious. During the time period in which she was touching the girls, she never objected to Wilson's sexualized comments regarding young girls and even participated in watching child pornography with Wilson. J.A. did not reject Wilson's proposals. And she did not merely accept Wilson's proposal to perform oral copulation on two young girls; she

33

responded by laughing and asking to "do [it] ASAP." When Wilson showed her photos of a young girl that he wanted her to sexually abuse, J.A. did not react with disgust, but instead expressed she found the girl to be "soo small and cute lol." This evidence, viewed in the light most favorable to the jury's verdict, supports the conclusion that J.A. touched the girls to obtain her own immediate sexual gratification.

Additionally, as the prosecution argued in opposition to Wilson's pretrial motion to set aside the information, the evidence established that J.A. participated in " 'non-mainstream' " sexual activities, supporting an inference that she would also participate in " 'non-mainstream' " child molestation.

On appeal, Wilson points to J.A.'s own statements that she had no sexual intent when she touched the girls. He also points to other evidence in the record suggesting she had no sexual interest in young girls because the incidents giving rise to the offenses here were isolated incidents tied to her need for money and she never lewdly touched any other minors. However, it is not this court's role on appeal to reweigh the evidence, resolve conflicts in the evidence, or make our own credibility determinations. (See, e.g., *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314 (*Jones*).) The jury rejected J.A.'s self-serving statements denying her sexual interest in children despite the evidence to the contrary and we must accept that determination. Considered as a whole, the evidence supports the jury's verdict.

### III.

*Wilson's Due Process Right to Notice of the Nature of the Charges*

Wilson contends his due process right to notice of the charges against him was violated when J.A. changed her testimony after the preliminary

34

hearing regarding the timing and contents of the photos she sent to Wilson and which formed the basis for the charges against him. He asserts that J.A.'s changing testimony between the preliminary hearing and trial deprived him of adequate notice of the charges against him.

A. *Additional Background*

At the preliminary hearing, J.A. testified that she believed the videos of her touching her daughter's buttocks and orally copulating her daughter were filmed and sent to Wilson on July 17, 2014. J.A. additionally testified that she could not remember when she took the photo of her cousin and sent it to Wilson, but that it occurred before the incidents involving videos of her daughter.

The information filed after the preliminary hearing alleged that all acts underlying the offenses occurred "between January 1, 2014 and August 20, 2015."

At trial, J.A. changed her testimony to now reflect her understanding that the girl in the July 17, 2014 video was her cousin, *not* her daughter. She admitted that she met with the prosecution immediately before trial and realized that the girl in the July video was not wearing a diaper, meaning it could not be her infant daughter. She further testified that the videos depicting her daughter were filmed and sent to Wilson in December 2014. Concerned with this change in testimony and the apparent lack of evidence to support the change, Wilson moved for a mistrial. The trial court denied the motion.

B. *Analysis*

In *Jones*, *supra*, 51 Cal.3d 294, another child molestation case, the Supreme Court considered "the extent to which the defendant's due process rights are implicated by the inability of his young accuser to give specific

35

details regarding the time, place and circumstances of various alleged assaults." (*Id.* at p. 299.)  As the court explained, "[t]he 'preeminent' due process principle is that one accused of a crime must be 'informed of the nature and cause of the accusation.' (U.S. Const., Amend. VI.)  Due process of law requires that an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial." (*Id.* at p. 317.)

When a case is initiated with the filing of an information, the defendant is afforded " 'practical notice of the criminal acts against which he must defend' " primarily by way of the preliminary hearing transcript.  (*Jones*, *supra*, 51 Cal.3d at p. 317.)  A defendant's right to notice does not encompass "notice of the *specific* time or place of an offense, so long as it occurred within the applicable limitation period." (*Ibid.*, italics added.)  " '[A]t a minimum, a defendant must be prepared to defend against all offenses of the kind alleged in the information as are shown by evidence at the preliminary hearing to have occurred within the timeframe pleaded in the information.' " (*Ibid.*, quoting *People v. Gordon* (1985) 165 Cal.App.3d 839, 870-871.)

Here, the information alleged that all offenses occurred between January 1, 2014, and August 20, 2015.  The information also specifically alleged that Wilson, through J.A., committed the specific acts of (1) orally copulating J.A.'s daughter and lewdly touching her vagina; (2) touching her buttocks; and (3) touching the buttocks of J.A.'s cousin.  Although J.A. repeatedly stated she could not recall specific dates, the evidence at the preliminary hearing and at trial was consistent with the dates in the information and consistent with the acts described in the information and at trial against the same victims.

36

Wilson compares this case to *People v. Ochoa* (2016) 2 Cal.App.5th 1227, in which the appellate court held that when the information alleged defendant committed the offenses against one victim, the prosecution could not seek his conviction at trial based on evidence that the offense was instead committed against a different victim. (*Id.* at pp. 1231-1232.) Doing so, the court reasoned, would violate the defendant's due process right to notice of the charges against him. (*Id.* at p. 1232.)

Here, unlike *Ochoa*, the allegations in the information and the testimony at the preliminary hearing were consistent with the evidence at trial regarding the identity of Wilson's victims and the offenses committed against them. At most, J.A.'s testimony differed on the specific dates on which the offenses were committed, but those dates remained within the time period alleged in the information. Variances between the preliminary hearing testimony and trial testimony regarding the time at which specific acts occurred are not material and do not deprive a defendant of adequate notice. (*People v. Calhoun* (2019) 38 Cal.App.5th 275, 306-309.) Accordingly, Wilson's contentions to the contrary have no merit.[16]

---

[16] Shortly before oral argument, Wilson submitted a notice of new authority pursuant to rule 8.254 of the California Rules of Court. In his notice, Wilson suggests that the recent decision in *People v. Hughes* (2020) 50 Cal.App.5th 257 supports his claim that his due process right to notice was violated. However, *Hughes* did not directly address the defendant's due process right to notice, but rather involved the prosecution's duties under section 1054 et seq. to disclose information and materials related to an expert witness's testimony before trial. (*Hughes*, at pp. 278-279.) Accordingly, the decision in *Hughes* does not change our opinion in this case.

## IV.

### *False Evidence*

Wilson argues that the prosecution knowingly adduced false testimony at trial to support its framing of the case. He contends that the prosecution argued to the jury that Wilson "groomed" the sisters by starting with innocuous photo shoots and slowly progressing to asking them to perform sexual acts. Wilson asserts this framing was only possible because of the false testimony by J.A. and her sister regarding their first photo shoot together.

As Wilson asserts, J.A. testified she never participated in a photo shoot in lingerie with her sister, who in turn testified that she did participate in such a photo shoot with J.A., but it occurred at least a year after the initial, fully-clothed photo shoot with both sisters. In his motion for a new trial, Wilson presented evidence that the sisters posed in lingerie the same day as their initial photo shoot and soon thereafter posed several times in increasingly risqué photo shoots.

The trial court denied the motion for new trial, finding that the evidence suggested the sister merely could not remember details, that the evidence to the contrary was available to Wilson before trial, and that any error was harmless because such evidence was not material.

As the Attorney General acknowledges on appeal, "[a] criminal judgment obtained through use of false evidence violates due process, whether the prosecution solicits the false evidence or simply allows it to go uncorrected when it appears." (*Campbell v. Superior Court* (2008) 159 Cal.App.4th 635, 652.) The prosecution may not knowingly present false evidence and must correct testimony "that it knows, or should know, is false or misleading." (*People v. Morrison* (2004) 34 Cal.4th 698, 716.)

38

Wilson, however, offers nothing more than speculation that the sisters knowingly committed perjury or that the prosecution knew their testimony was false. As both sisters frequently testified, they admittedly could not remember the exact sequence of the numerous photo shoots that had taken place years earlier and had actively tried to forget what they had done with Wilson. The plain impression of their testimony suggests that given the sheer multitude of photo shoots, the sisters could not remember some of the specific events and their timing, *not* that they were intentionally offering false testimony. Given this topic was not a central element of the offenses, the record likewise does not establish the prosecution knowingly adduced this testimony or failed to correct it despite its knowledge of its falsity.

Moreover, even assuming some error, Wilson does not establish he was prejudiced. A conviction premised on false evidence is reversible only when the defendant shows that if such evidence were *not* introduced, it is reasonably probable that the jury would have reached a different result. (See, e.g., *In re Roberts* (2003) 29 Cal.4th 726, 742.)

Wilson does not meet his burden. Given the overwhelming evidence at trial regarding Wilson's treatment of the sisters, any discrepancy in the precise sequence of their earlier photo shoots was immaterial and it is not reasonably probable that if the jury was aware of the true sequence of photo shoots, it would have concluded that Wilson did not aid and abet the touching of the young girls. On appeal, Wilson contends that J.A.'s false testimony regarding the early photo shoots was part of her effort to rehabilitate her own image and "lay blame on [Wilson] for the molests of her daughter and [cousin]." However, even accepting this framing, J.A. failed to rehabilitate her image regardless of her testimony regarding the early photo shoots. As discussed *ante*, the jury did not believe J.A.'s testimony regarding her own

39

sexual desires for her daughter and cousin and suggestion that she was merely Wilson's unwitting pawn. In light of the jury's disregard for other portions of J.A.'s testimony aimed at evading responsibility, it is unlikely that more information regarding her participation in the early risqué photo shoots would have led to a different result as to Wilson. Accordingly, there is no basis for reversal in this regard.

## V.

### *Brady Error*

In an argument related to his claim regarding false evidence, Wilson contends the prosecution failed to disclose photos in its possession depicting the early "sexually charged photo shoots" with both sisters, which could have been used at trial to impeach their testimony that no such photo shoot occurred. Wilson contends this failure to disclose the photos stored on hard drives seized from him violated the prosecution's duties under *Brady*, *supra*, 373 U.S. 83.

Wilson raised this claim at trial after the sisters completed their testimony. He asked the court to order the prosecution to turn over any photos in its possession depicting either of the sisters. The prosecutor informed the court that he had offered to provide those photos to Wilson's counsel months before trial, but defense counsel declined. Wilson's counsel admitted that he declined the offer, but told the court that given the sister's unexpected testimony he thought the photos were now relevant. The court accepted the prosecution's consent to providing the photos as soon as possible. However, at the end of the last day of testimony at trial, the prosecution informed the court that it learned it would take at least a week to obtain the photos given the complex standards for copying and producing such sensitive files. Defense counsel suggested he needed to review the files before the trial

40

concluded to preserve Wilson's rights to a fair trial, but the court denied the request. The court noted that any deprivation in this regard was the fault of defense counsel, who declined the prosecution's offer to disclose the material over a month before trial. Wilson later raised the same issue in his motion for new trial, which the trial court likewise denied. The trial court explained that this photographic evidence "was not exculpatory evidence, at best it impeached [the sisters] on a minor point." Finding the evidence had been offered to Wilson before trial, the court ultimately concluded that Wilson was not prejudiced because "[i]t is not reasonably probable that the result would have been different had the evidence been disclosed."

We agree with the trial court. Under *Brady*, the prosecution has the obligation to disclose to the defense all material exculpatory evidence. (*Brady*, *supra*, 373 U.S. at p. 87.) "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282; see also *People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 710.) A defendant establishes prejudice by showing the evidence was material, i.e., if the evidence had been disclosed, there is a reasonable probability that the result of the trial would have been different. (*People v. Jenkins* (2000) 22 Cal.4th 900, 954.)

On appeal, we review a claim of *Brady* error de novo "but give great weight to any trial court findings of fact that are supported by substantial evidence." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176.)

Here, Wilson fails to establish that the evidence was suppressed by the government. Before trial, the prosecution offered the photos to Wilson's

41

counsel, but he declined to review them. Moreover, even assuming the prosecution had some duty to produce the photos despite defense counsel's disinterest, Wilson fails to demonstrate the requisite prejudice because the photos were not material. As discussed *ante* regarding the same evidence, the minor issue regarding the sequence of the early photo shoots was not a central element of the prosecution's case, even if we focus, as Wilson requests, on the "grooming theory" of Wilson's liability. If Wilson obtained the photos to use as impeachment evidence at trial, he would have merely shown that the sisters had imperfect recollection of their past interactions with Wilson. Regardless of the sequence of events not directly related to the charged offenses, it is not reasonably probable that the jury would have reached a different result if it heard impeachment evidence on this issue. Thus, we conclude there was no *Brady* error requiring reversal.

Wilson alternatively argues that his counsel's failure to obtain the photos before trial constitutes ineffective assistance of counsel. Like the standard for *Brady* error, an appellant asserting his counsel was ineffective must show a deficient performance *and* that absent the alleged ineffectiveness, there is a reasonable probability of a more favorable result. (*People v. Waidla* (2000) 22 Cal.4th 690, 718.) For the same reasons discussed *ante*, we conclude there was no such prejudice even assuming counsel's performance was deficient.

## VI.

### *Instructional Error*

Wilson raises four claims regarding jury instructions. He contends the court erred in failing to give two additional instructions regarding unanimity and conspiracy, a set of instructions was unduly prejudicial, and the court's response to a jury question misconstrued the law.

A. *Unanimity Instruction*

Wilson alleges the trial court had a duty to provide a unanimity instruction to the jury. We disagree.

Wilson contends that J.A.'s testimony presented multiple instances that could separately support the charged offenses because she testified she touched the girls on multiple occasions. According to Wilson, in light of the possibility that the jurors relied on separate instances to support their verdict, the court erred in not instructing the jury that it must unanimously agree on the same specific act as supporting its verdict as to each offense.

The Attorney General does not dispute that the jury's verdict must be unanimous, but contends no unanimity instruction was required here.[17] A criminal defendant has a constitutional right to a unanimous jury. (See, e.g., *People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "To protect this right, 'if one criminal act is charged, but the evidence tends to show the commission of more than one such act, "*either* the prosecution must elect the specific act relied upon to prove the charge to the jury, *or* the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act." [Citations.]' (*People v. Napoles* (2002) 104 Cal.App.4th 108, 114.)" (*People v. Brown* (2017) 11 Cal.App.5th 332, 341 (*Brown*).)

As Wilson notes, the jury heard evidence tending to show the commission of more than one act that could support some of the charged

---

[17]     In his notice of new authority, Wilson also cites the Supreme Court's recent decision in *Ramos v. Louisiana* (2020) ___ U.S. ___ [140 S.Ct. 1390, 206 L.Ed.2d 583], which held that the Sixth Amendment's unanimity requirement applies to criminal trials in state courts. Given California's existing requirement of a unanimous verdict, the Supreme Court's decision has no direct effect on California and does not change our analysis. Nothing in *Ramos* suggests that a unanimity instruction was required in this case under the factual circumstances we discuss *post*.

43

offenses.  This, however, does not necessarily mean a unanimity instruction was required.  As the *Brown* court explained, the presentation of evidence showing the commission of more than one act supporting a charged offense creates the requirement of either a unanimity instruction *or* the " 'prosecution must elect the specific act relied upon to prove the charge to the jury.' " (*Brown, supra*, 11 Cal.App.5th at p. 341.)  "The prosecution can make an election by 'tying each specific count to specific criminal acts elicited from the victims' testimony'—typically in opening statement and/or closing argument.  [Citations.]  Such an election removes the need for a unanimity instruction.  [Citation.]  [¶]  Under these principles, there is an implicit presumption that the jury will rely on the prosecution's election and, indeed, is bound by it." (*Ibid.*)

Here, the prosecution made such an election in closing argument.  The prosecution expressly claimed that the first two counts were premised on J.A.'s oral copulation of her daughter in December.  Similarly, the prosecution argued that Counts Three and Four were premised on the specific acts of touching the two girls in the incidents where J.A. sent the photographs and videos to Wilson.  Although J.A. suggested she touched her cousin on a different occasion, the prosecution expressly did not seek to establish Wilson's guilt on an incident in which there was no photograph or video shown at trial.  By making such an election, the prosecution negated the need for a unanimity instruction.  (*Brown, supra*, 11 Cal.App.5th at p. 341.)  Thus, Wilson's claim to the contrary has no merit.

B. *Conspiracy Instructions*

Wilson asserts the trial court had a sua sponte duty to give a jury instruction clarifying that Wilson was not responsible for J.A.'s acts before he joined the alleged conspiracy.  As Wilson notes, "[a] conspirator cannot be

44

held liable for a substantive offense committed pursuant to the conspiracy if the offense was committed *before* he joined the conspiracy." (*People v. Marks* (1988) 45 Cal.3d 1335, 1345.) On this point, Wilson contends the court should have instructed the jury with CALCRIM No. 419, which provides: "(The/A) defendant is not responsible for any acts that were done before (he/ [or] she) joined the conspiracy. [¶] You may consider evidence of acts or statements made before the defendant joined the conspiracy only to show the nature and goals of the conspiracy. You may not consider any such evidence to prove that the defendant is guilty of any crimes committed before (he/ [or] she) joined the conspiracy."

"A trial court's duty to instruct, sua sponte, on particular defenses arises ' "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' " (*People v. Maury* (2003) 30 Cal.4th 342, 424.)

Wilson contends on appeal that his central defense falls under this instruction and there was "substantial evidence the charged acts occurred before [Wilson] joined any conspiracy or aided and abetted the charged crimes." This contention on appeal, however, is belied by the evidence at trial.

As Wilson did not testify at trial and offered no affirmative evidence in defense, his opening brief on appeal relies primarily on his counsel's closing argument to claim there was evidence he did not join the conspiracy until after J.A. committed the acts. As the jury was instructed, however, the arguments of counsel are not evidence.

At most, Wilson points to an e-mail introduced at trial in which he told another woman that J.A. sent him a video with her daughter as a surprise

45

and " 'I didn't even ask for it.' "  This evidence, however, does not support his contention on appeal that he joined the conspiracy with J.A. after she performed her criminal act.  Rather, it supports his central defense that there was no conspiracy at any time.

Wilson's chief defense at trial was that the prosecution failed to show that he solicited the photos and videos such that there was no conspiracy or aiding and abetting.  Following his statement to the other woman in the e-mail, he asserted J.A. sent him the photos and videos on her own initiative and her evidence to the contrary was not unequivocally supported by the record of their communications.

In accordance with this defense, the jury was properly instructed on the elements of conspiracy, including, inter alia, the requirement that Wilson agreed with J.A. to commit the offenses.  In contrast to his defense that he never joined the conspiracy, no evidence at trial suggested Wilson did join the conspiracy, but only did so after J.A. had already committed any acts underlying the charged offenses.  Thus, an additional instruction was not warranted in this regard.

Regardless, we conclude that even if the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 419, and even if that error constituted misinstruction on the elements of an offense, the error was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24.)  The conspiracy instructions that were given clearly informed the jury that Wilson's culpability required an agreement to commit the offenses before J.A. committed the acts, which the evidence undisputedly showed J.A. did commit.  The evidence also established that Wilson repeatedly made "proposals" to J.A. to pay her to perform the acts, record

46

them, and send him copies of the resulting photos and videos. In the absence of any evidence to the contrary, there was no prejudicial error.

C. *Instructions Regarding Evidence of Other Crimes*

At trial, the prosecution presented evidence regarding uncharged criminal offenses. The prosecution relied on this evidence of similar yet uncharged crimes to prove Wilson's propensity to commit the charged offenses. (See, e.g., Evid. Code, § 1108; *People v. Villatoro* (2012) 54 Cal.4th 1152, 1159-1166.) The court instructed the jury that "The People presented evidence that the defendant" committed these uncharged offenses, which if proven by a preponderance of the evidence, could be considered "for the limited purpose of deciding whether the defendant acted" with the requisite intent for the charged offenses.

The court repeated the phrase, "The people presented evidence that the defendant" committed criminal offenses, multiple times in succession. As Wilson concedes on appeal, he did not object to these instructions. However, asserting the issue is not forfeited, he contends that the repetition of the phrasing that the prosecution "presented evidence that the defendant" committed offenses improperly signaled to the jury that the court was giving an opinion that the evidence established that Wilson did indeed commit the referenced offenses.

We reject Wilson's claim of alleged prejudice. Standard jury instructions regarding the use of uncharged offenses to establish intent include the introductory phrase that Wilson challenges here. (See, e.g., CALCRIM Nos. 375, 852A, 852B, 1191A, 2840.) An instruction simply stating that the prosecution "presented evidence" that the defendant committed a crime is not synonymous with stating the evidence is credible or that the defendant did indeed commit the crime. The given jury instructions

47

properly informed the jury of its role in evaluating whether the evidence was sufficient to establish Wilson's guilt. The jury was properly instructed that it had the duty to decide "what the facts are," that Wilson is presumed to be innocent, and that the prosecution must prove Wilson's guilt beyond a reasonable doubt. Considering the totality of the instructions, we conclude that the instructions did not mislead the jury or otherwise suggest to the jury that the court had determined Wilson was guilty. (See, e.g., *People v. Reliford* (2003) 29 Cal.4th 1007, 1013 ["[W]e must view a challenged portion 'in the context of the instructions as a whole and the trial record' to determine ' "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' "].)

D. *Response to Jury Question Regarding J.A.'s Sexual Intent*

Wilson contends the court erred in answering a jury question regarding the element of J.A.'s intent for the section 288, subdivision (a) offenses. The jury was correctly instructed that the People had to prove that J.A. "committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of herself or the child."

As discussed *ante*, J.A. testified that she touched the children only because she needed money. After it began deliberations, the jury sent a question to the court, asking whether the "lust" and "passion" referred to in the jury instruction could be "financial, or other types of 'lust, passion.' " After consulting with the parties' counsel, the court replied that "[t]he specific intent required for Counts 2-4 cannot be solely financial. 'Lust' refers to sexual arousal or sexual gratification of the perpetrator or child." Wilson's counsel argued before the trial court that stating the intent cannot be "*solely* financial" (italics added) may be confusing, but the court explained that the

48

intent of the first sentence was to "make[] it clear that there could be multiple intents going on."

On appeal, Wilson contends the court's answer misconstrued the law and altered the intent requirement for section 288. We disagree. "When reviewing ambiguous instructions, we inquire whether the jury was 'reasonably likely' to have construed them in a manner that violates the defendant's rights." (*People v. Rogers* (2006) 39 Cal.4th 826, 873.)

The court's reply clearly indicated to the jury that it must find J.A. acted with sexual intent. Simply stating that J.A. could have acted for multiple reasons, both sexual and financial, did not alter the requisite finding of sexual intent. Wilson provides no authority to suggest that a perpetrator must commit a section 288, subdivision (a) offense with a singular, sexual intent. Nothing in the evidence suggests that sexual intent and financial intent are mutually exclusive, or that any financial intent affected J.A.'s sexual intent. The jury was not reasonably likely to have construed the court's reply as negating its duty to make the required finding of sexual intent. We reject Wilson's claim of error.

## VII.

### *Prosecutorial Misconduct*

Wilson asserts his due process rights were infringed due to several prosecutorial errors that rendered the trial inherently unfair. He contends the prosecutor (1) falsely claimed in his opening statement that text messages sent by Wilson to J.A. existed but those text messages were not introduced into evidence at trial; (2) met with J.A. immediately before trial to "script[]" her testimony to fit the documentary evidence; (3) used inflammatory language by calling Wilson a "special type of child molester" during his opening statement; and (4) improperly vouched for J.A.'s

49

credibility. He also contends the court erred in not correcting these errors, regardless of whether Wilson's counsel objected at the time.

As Wilson concedes on appeal, his counsel did not object to any of these allegedly improper acts by the prosecution.[18] Setting aside any issues of forfeiture, we conclude there was no prejudicial error by the prosecutor and, by extension, the trial court. Most importantly, even assuming each act complained of by Wilson was wrongful, Wilson fails to establish that the alleged errors warrant reversal. Wilson must establish that "there is at least a reasonable probability that a more lenient verdict would have been returned in the absence of the errors." (See, e.g., *People v. Vance* (2010) 188 Cal.App.4th 1182, 1207; see also *People v. Rodriguez* (2020) 9 Cal.5th 474, 487 [reviewing claims of improper prosecutorial vouching and noting "that courts have often found that brief statements such as those before us have limited prejudicial effect"]; *People v. Armstrong* (2019) 6 Cal.5th 735, 798 [holding prosecutorial misconduct was not prejudicial under standard established by *People v. Watson* (1956) 46 Cal.2d 818, 836].)

Wilson fails to meet this standard. Even if we consider the claims of misconduct cumulatively, they are not sufficient to have deprived Wilson of a fair trial. The evidence of his guilt was so overwhelming that it is not reasonably probable the jury would have reached a different verdict in the absence of the alleged prosecutorial acts.

---

[18] Wilson argues the issues were not forfeited, but also contends that to the extent an objection was necessary, his counsel was ineffective for failing to object.

# VIII.

## *Cruel and Unusual Punishment*

Wilson asserts his indeterminate term of life imprisonment constitutes cruel and unusual punishment in violation of both the California and United States Constitution "under the facts and circumstances of this case and for this offender." (See U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.) "Whether a punishment is cruel and/or unusual is a question of law subject to our independent review, but underlying disputed facts must be viewed in the light most favorable to the judgment." (*People v. Palafox* (2014) 231 Cal.App.4th 68, 82.)

Wilson does not dispute that the trial court's imposed sentence was mandatory under the relevant statutes given his conviction of oral copulation under section 288.7, subdivision (b), and the jury's true findings under section 667.61, subdivision (b). (§ 667.61, subds. (b), (c)(7), (c)(8), (e)(4) [establishing mandatory sentence of 15 years to life for any person convicted of multiple enumerated sexual offenses against more than one victim].) He also does not appear to challenge the sentencing scheme facially. Instead, he focuses on the imposed sentence as applied to him.

Although the mandatory nature of his sentence does not end our inquiry, we grant the Legislature great deference. "[T]he determination of whether a legislatively prescribed punishment is constitutionally excessive is not a duty which the courts eagerly assume or lightly discharge. Here, as in other contexts, ' "mere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears." ' " (*In re Lynch* (1972) 8 Cal.3d 410, 414-415 (*Lynch*).) Findings of disproportionality are exceedingly rare and occur only in extraordinary cases. (*Lockyer v.*

*Andrade* (2003) 538 U.S. 63, 73; *People v. Em* (2009) 171 Cal.App.4th 964, 972 (*Em*).)

The Eighth Amendment of the United States Constitution forbids only sentences that are "grossly disproportionate" to the crime. (*Ewing v. California* (2003) 538 U.S. 11, 20.) This proportionality principle is narrow when applied in noncapital cases. (*Ibid*.) Somewhat distinctly, under the California Constitution, a punishment is cruel or unusual "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch*, *supra*, 8 Cal.3d at p. 424; see also *People v. Dillon* (1983) 34 Cal.3d 441, 478 (*Dillon*).)

"*Lynch* describes three 'techniques' to determine whether a sentence is so disproportionate to the crime as to constitute cruel or unusual punishment. [Citation.] We first consider 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.' [Citation.] Next, we compare the sentence to 'punishments prescribed in the *same jurisdiction* for *different offenses* which, by the same test, must be deemed more serious.' [Citation.] Finally, we compare the sentence 'with the punishments prescribed for the *same offense* in *other jurisdictions* having an identical or similar constitutional provision.' [Citation.] The weight afforded to each prong may vary by case. [Citation.] 'Disproportionality need not be established in all three areas.' " (*People v. Baker* (2018) 20 Cal.App.5th 711, 723 (*Baker*).)

On appeal, Wilson does not present an argument regarding each of these techniques, but rather focuses on what he characterizes as his minimal culpability as a non-perpetrator. As Wilson argues, he "was not present

52

when [J.A.] committed the molest acts, did not force her to commit them, and was not aware she was committing the acts when she did them."

Wilson's argument ignores that under California law, a direct aider and abettor with the requisite mental state is equally guilty of committing the intended crime as the direct perpetrator. (§ 31.) " '[W]hen an accomplice chooses to become a part of the criminal activity of another, [he] says in essence, "your acts are my acts," and forfeits [his] personal identity. We euphemistically may impute the actions of the perpetrator to the accomplice by "agency" doctrine; in reality, we demand that [he] who chooses to aid in a crime forfeits [his] right to be treated as an individual.' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

In *People v. Gonzales* (2001) 87 Cal.App.4th 1, the court rejected the defendants' argument that because they were merely aiders and abettors, their sentences equal to that imposed on a direct perpetrator were cruel and unusual. (*Id.* at pp. 16-17.) Looking at the circumstances of the offense—a murder in that case—and the defendants' participation, the court concluded that the imposed sentences were not cruel and/or unusual as applied to the defendants even though they were not the shooter. (*Ibid.*; see also *Em*, *supra*, 171 Cal.App.4th at pp. 974-975 [considering proportionality of aider and abettor's sentences based on their "integral assistance" in commission of offense].)

We apply the same analysis here. Wilson's role as an aider and abettor does not negate his significant participation in the offenses. Although he did not directly molest the girls, Wilson was the central figure leading to their sexual abuse. The evidence at trial established that he sent proposals to J.A. to take advantage of her trusted role as a mother and caretaker to reach young children that were beyond Wilson's own reach. By taking advantage of

J.A.'s desperate financial need and leading her into increasingly sexually explicit acts, Wilson enabled the molestation of these young, vulnerable children. Although the jury found J.A. harbored her own sexual desires, there is a strong likelihood that without Wilson's instigation and offer of payment, the abuse would have never occurred. Thus, rather than being an unwitting minor assistant, Wilson was the central figure in the offenses.

We also reject Wilson's suggestion that unlike other sexual offenses against older children, the harm to the victims here was minimal because there is no evidence the girls "were even aware the conduct occurred or suffered any type of psychological or physical trauma." California courts have long recognized "a strong public policy to protect children of tender years." (*People v. Olsen* (1984) 36 Cal.3d 638, 646.) "Along a spectrum ranging from murder, mayhem, and torture on one end to petty theft on the other, 'lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable.' " (*Baker*, *supra*, 20 Cal.App.5th at pp. 724-725.) Rather than decreasing his culpability, the vulnerability of the girls given their young age is an aggravating circumstance. (*Id*. at p. 725.) Similarly, Wilson's culpability is heightened by aiding J.A. to abuse her trusted position as a mother and caregiver to assault the children by invidiously abusing the trust the girls placed in her. (See, e.g., *People v. Gomez* (2018) 30 Cal.App.5th 493, 501-502.)

Wilson also relies on his criminal-free history, college education, and general good standing in society to suggest the punishment is disproportionate when applied to him. "Although these factors are favorable to him, they do not outweigh the other factors." (*Baker*, *supra*, 20 Cal.App.5th at p. 725.) Rather than suggesting a need for leniency, his education and self-proclaimed success in life suggest he was aware of the

54

severity of his actions and did not embark on his criminal path due to an incomplete understanding of its severity and effect. A college education and good job are not a "free pass" to commit heinous acts while avoiding the harshest penalties that apply to those perceived to be of a lower standing.

Finally, Wilson contends that the prosecution's plea deal with J.A., which resulted in her not serving any prison time despite her role as the direct perpetrator, demonstrates how disproportionate his sentence is to his culpability. To support this contention, Wilson relies on the Supreme Court's decision in *Dillon*, in which the court relied on the discrepancy between the defendant's life sentence and the sentences of his aiders and abettors, none of whom were sentenced to any prison time. (*Dillon*, *supra*, 34 Cal.3d at p. 488.) The court held that the excessiveness of the defendant's sentence was "underscored by the petty chastisements handed out to the six other youths who participated with him in the same offenses." (*Ibid*.) Thus, the difference between defendant's heavy sentence compared to "the proverbial slap on the wrist" received by the other defendants was a relevant factor in the court's holding that the defendant's life sentence was cruel and unusual. (*Ibid*.)

Wilson, however, ignores that while the *Dillon* court compared the defendant's sentence to some of his aiders and abettors, it declined to compare the defendant's sentence to the one aider and abettor who was granted immunity "for giving evidence against all the others." (*Dillon*, *supra*, 34 Cal.3d at p. 488, fn. 40.) Plea agreements premised, in part, on an offender's cooperation with law enforcement are not unusual and an admission of guilt and agreement to cooperate often has an effect on the imposed sentence. (See, e.g., *People v. Perez* (2016) 243 Cal.App.4th 863, 879-880.) Here, J.A. entered an agreement with the prosecution premised on her cooperation with law enforcement and agreement to testify against

Wilson. Wilson, obviously, did not cooperate and still denies his guilt. Accordingly, comparing the sentences of Wilson and J.A. by ignoring the effect of J.A.'s cooperation fails to provide an appropriate comparison in regard to proportionality.

Beyond his challenge to his sentence as a non-perpetrator as compared to the sentence for J.A. and reliance on his personal history, Wilson makes no effort on appeal to challenge his sentence as being disproportionate as compared to the sentences for other more serious crimes or sentences imposed for similar sentences in other states. By failing to make a challenge to his sentence under those techniques for applying the constitutional analysis in his opening brief, we deem the issues forfeited. (See, e.g., *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.) Considering the claims raised by Wilson, we do not find this case to be one of the exceedingly rare cases warranting a finding that the imposed sentence is disproportionate to defendant's culpability. Accordingly, Wilson fails to show that his sentence violates the Eighth Amendment or the California Constitution.

IX.

*Cumulative Error*

Wilson contends that even if the alleged errors standing alone did not deny him a fair trial, the cumulative effect of these errors unfairly denied him his due process rights. His claim of cumulative error must demonstrate that absent the errors, there is a reasonable probability the jury would have reached a more favorable result. (*People v. Holt* (1984) 37 Cal.3d 436, 458.) Wilson has not met this burden. For the reasons stated *ante*, we conclude his

conviction was not the result of any prejudicial error. For the same reasons, his claim of cumulative error has no merit.

DISPOSITION

The judgment is affirmed.


GUERRERO, J.

WE CONCUR:


McCONNELL, P. J.


BENKE, J.